[No. G036451. Fourth Dist., Div. Three. May 14, 2007.]

PADILLA CONSTRUCTION COMPANY, INC., Plaintiff and Appellant, v. TRANSPORTATION INSURANCE COMPANY, Defendant and Respondent.

986

**COUNSEL**

Kolod Wagner Law Offices, Scott M. Kolod, Jerome A. Wagner and Lee I. Jurewitz for Plaintiff and Appellant.

Berger Kahn, Ross C. Smith and David B. Ezra for Defendant and Respondent.

**OPINION**

**SILLS, P. J.—**

## I.   BACKGROUND

California's rule of "horizontal exhaustion" in liability insurance law requires all primary insurance to be exhausted before an excess insurer must "drop down" to defend an insured, including in cases of continuing loss. (*Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 339 [57 Cal.Rptr.2d 755].)[1] Unless there is excess insurance

---

[1] "It is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until *all* of the primary insurance has been exhausted. . . . [¶] The California general rule that *all* primary insurance must be exhausted before a secondary insurer will have exposure favors and results in what is called 'horizontal exhaustion.' " (*Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra,* 50

that describes underlying insurance and promises to cover a claim when that specific underlying insurance is exhausted ("vertical exhaustion"[2]), the rule of horizontal exhaustion applies to cases of alleged continuing property damage—as often happens when the insured is sued for construction defects. (*Id.* at p. 340.)

■ Also, in *Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th 645,[3] our Supreme Court adopted a "continuous injury trigger" as the test for the defense obligation of traditional, occurrence-based primary commercial liability insurance when the underlying claims involve continuous or deteriorating damage. The continuous injury trigger generally means (absent consideration of some defense other than trigger itself that would render no claim in the underlying suit even potentially covered) that all primary insurers over the time of the alleged continuous injury will be obligated to defend an underlying action claiming such continuous damage.[4]

Justice Croskey prophesied in *Community Redevelopment* that the issue of horizontal versus vertical exhaustion would become "increasingly common" in light of the California Supreme Court's adoption of the continuous injury trigger in *Montrose II.* (See *Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra,* 50 Cal.App.4th at p. 340.) This case validates Justice Croskey's prophecy, in that it presents us with two major problems inherent in a rule of horizontal exhaustion interacting with a continuous injury trigger.

Cal.App.4th at p. 339, original italics.) Even so, a rule of drop-down upon "vertical exhaustion" is possible in California when a provision in an excess policy states specifically that it is excess over a "specifically described policy and will cover a claim when that specific primary policy is exhausted." (*Id.* at p. 340, fn. 6.) The case before us, however, involves no such excess policy.

[2] "Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose [Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878]]." (*Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra,* 50 Cal.App.4th at p. 340, original italics.)

[3] *Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th 645, is often called *Montrose II* in the literature, to distinguish it from *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287 [24 Cal.Rptr.2d 467, 861 P.2d 1153], which is often called *Montrose I.*

[4] This specific point is perhaps most clearly expressed in this passage on page 675 of *Montrose II, supra,* 10 Cal.4th 645: "*The continuous injury (or multiple) trigger.* Under this trigger of coverage theory, bodily injuries and property damage that are continuous or progressively deteriorating throughout successive policy periods are covered by all policies in effect during those periods." (See also *Montrose II, supra,* 10 Cal.4th at p. 695 (conc. opn. of Baxter, J.) ["What matters is that the coverage language can *plausibly* be read, as Montrose suggests, to mean that each *increment* of harm, whether to person or property, which 'occurs' during a particular policy period is covered by the policy then in effect."].)

The first problem involves whether an excess insurer has a duty to "drop down" and defend in an underlying action alleging that the insured caused continuous property damage that existed at points in time *prior* to the inception of a policy of the only primary insurer that is defending the insured. On this point, the insured's theory (the insured is the appellant here) is that since there is no way at all that the primary insurer would have any duty to indemnify the insured for any liability for property damage that occurred *prior* to the primary insurer's policy inception, there was no "other insurance" available for *that* prior occurring property damage. Therefore the excess insurer had to drop down and defend because of the potential for liability for the increment of damage occurring before the one defending primary's policy period.

■ The solution to this problem is relatively easy. As we show below, under *Buss v. Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766], the lone defending primary insurer had a duty to "defend entirely," and so, from the point of view of the excess insurer, there was indeed "other insurance" available—that is, other insurance to undertake the task of *defending* the insured. Accordingly, the mere fact that portions of the continuous damage could not possibly have been covered by the primary insurer makes no difference as far as the excess insurer's duty to defend is concerned.

The other problem builds on the implications of whether there is "other insurance available" within the meaning of the excess insurer's policy when the lone defending primary insurer's policy contains a "self-insured retention" or SIR. In Justice Croskey's own treatise on insurance law, he (or his co-authors) suggest that because SIR's are not considered insurance, there would be no need to exhaust such an SIR before the policy of an excess insurer covering another policy period could be triggered.[5] The question thus arises: Does the treatment of SIR's as "not insurance" mean that, in a situation like the present case, there would be no "other insurance available" for the first x dollars (x representing the self-insured retention) spent on the underlying action, and *therefore* the excess insurer (whose own underlying

---

[5] Here is the passage, which immediately follows a section discussing the rule of horizontal exhaustion and then raising the possibility of contribution claims between insurers: "Although there is no known authority on point, each [insurer] apparently is liable only in accordance with its own policy provisions. Thus, each should be able to invoke any deductibles, SIRs (self-insured retentions) and 'per occurrence' limits in its policy to control the amount that it must contribute. But a deductible or SIR apparently is not treated as 'insurance' which must be exhausted before *any* excess policies covering other policy periods will attach." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 8:256, pp. 8-55 to 8-56, original italics.)

primary insurer has already exhausted) would have a duty to defend to at least that extent?

We reject the idea for several reasons, the primary of which is it is perfect legal logic leading to absurdity—that is, it would be contrary to the reasonable expectations of all parties by obliterating the distinction between excess and primary insurance. An excess insurer could end up defending a claim before the primary insurer had an obligation to defend that claim! Reasonable insureds don't expect to receive a defense from a typically much cheaper excess policy unless all the expensive primary insurance they bought has been exhausted. Moreover, such an idea ignores the substance of the lone defending primary insurer's relationship with the insured. That relationship is to act as primary insurer, with a normal defense duty, not an excess insurer on top of other insurers.

In sum, under the facts of this case, the tail end, lone defending primary insurer cannot "share the misery" with the first-period excess insurer. (See *State of California v. Pacific Indemnity Co.* (1998) 63 Cal.App.4th 1535, 1545–1548 [75 Cal.Rptr.2d 69] [primary insurer on risk for one year out of 43 had to bear the entire costs of defense of underlying action because insured had no other insurance during any of the other 42 years].) Accordingly, the trial court's judgment to that effect was correct, and is affirmed.

## I.  FACTS

There was an underlying continuous damage construction defect suit filed in June 2002 by two homeowners against the developer of their property. Specifically, the suit alleged that foundation vents were blocked with stucco, which stucco work was done by the insured, Padilla Construction Company, Inc., in 1995.[6] (We shall refer to Padilla as "the insured" often in this opinion.) The insured was brought into the suit two months later by way of cross-complaint by the developer.

The insured had four successive primary liability policies from January 1995 until March 1, 2003:

—From the beginning of 1995 to end of 1996: Transcontinental Insurance.

---

[6] The suits were filed in June 2002 by the owners of two houses at the Crow Creek development in Castro Valley, where Padilla Construction had done plastering work. From the statement of stipulated facts: "Although the complaint alleged that virtually everything was wrong with the plaintiffs' houses, investigation revealed that the primary issues involved foundation drainage problems, excessive crawl space moisture problems, and resulting damage, decay and mold contamination to the under-floor framing. Padilla's work was implicated by allegations that the foundation vents at some locations were blocked with stucco."

—From the beginning of 1997 to end of 1997: Reliance Insurance.

—From the beginning of 1998 to March 1, 2001: Legion Indemnity.

—From March 1, 2001, to March 1, 2003: Steadfast Insurance.

Additionally, coincident with Transcontinental's primary policy (Jan. 1995 through the end of 1997), the insured had two yearly commercial umbrella policies issued by Transportation Insurance Company.

In tabular form, over the period of the continuing loss, the policies may be expressed this way:

| Time | 1995–1996 | 1997 | 1998–March 2001 | March 2001–March 2003 |
|------|-----------|------|-----------------|------------------------|
| Excess | Transportation | | | |
| Primary | Transcontinental | Reliance | Legion | Steadfast |

We will refer to Transcontinental as the Stage 1 Primary Insurer, Transportation as the Stage 1 Umbrella Insurer,[7] and Steadfast (the "lone defending primary insurer" of the introduction) as the Stage 4 Primary Insurer.

Of the four primary insurers, only two were available to defend the insured in the underlying suit. Both Reliance and Legion became insolvent, and both sides in this case have assumed that nothing was available from either carrier by way of a defense. We will also operate on that assumption.

The insured initially requested only Stage 1 Primary Insurer to provide it a defense of the underlying suit. (The request was made in late Sept. 2002.) However, after the Stage 1 Primary Insurer accepted the request for a defense under a reservation of rights, and hired a firm to defend the insured, the

---

[7] Technically, there is a difference between umbrella and excess policies. Umbrella coverage is a "type" of excess coverage, typically providing, as in the present case, for losses for which there may be no "underlying" insurance. The other type of excess coverage is " 'following form' coverage" which, as the name indicates, follows the form of a specific underlying policy. Because umbrella insurance provides coverage " 'for certain losses for which there may be no underlying insurance,' " they provide " 'broader coverage than the underlying insurance.' " (*Century Indemnity Co. v. London Underwriters* (1993) 12 Cal.App.4th 1701, 1707, fn. 5 [16 Cal.Rptr.2d 393].) By the same token they provide broader coverage than "form following" excess policies. As a recognition that the insured does receive broader coverage under an umbrella excess than a form following policy, we will refer to Transportation as the Stage 1 "Umbrella" Insurer rather than as the "Stage 1 Excess Insurer," even though the analysis in this case is (because of the exhaustion of the policy of Transcontinental (the Stage 1 Primary Insurer)) the same.

newly hired defense counsel then requested a defense from Stage 4 Primary Insurer. The request for a defense, however, was routed through the insured's third party claims administrator. In April 2003 the third party claims administrator took the position, on the insured's behalf, that it "elect[ed]" not to trigger the Stage 4 Primary Insurer's policies, at least in part because the Stage 4 Primary Insurer's policies had a $25,000 self-insured retention. (The mechanics of the self-insured retention are discussed in part III. below, when we set forth the policy language bearing on this case.)

However, in June 2003—just a few months after the insured's (at least putative) election not to trigger Stage 4 Primary Insurer's policies, the Stage 1 Primary Insurer notified the insured that, because of numerous other claims against the insured, its policies were nearing exhaustion. In response, the insured reiterated its position that it elected not to trigger the Stage 4 Primary Insurer's policies, and requested its defense attorney to "tender the defense and indemnity" to Transportation, which we will refer to as the Stage 1 Umbrella Insurer. The Stage 1 Umbrella Insurer quickly declined the tender on the ground that the Stage 4 Primary Insurer's policies had not yet exhausted.

The Stage 1 Primary Insurer's exhaustion formally occurred on December 30, 2003. Along with the exhaustion came a formal notification to the insured that the Stage 1 Primary Insurer's defense was being entirely withdrawn. The insured then assumed its own defense, and, at some point in 2005, reached a settlement with the developer. The settlement was presumably $60,000 or less, to which the Stage 4 Primary Insurer contributed.

This coverage litigation between the insured and the Stage 1 Umbrella Insurer ensued, the insured's theory being that the Stage 1 Umbrella Insurer had a duty to "drop down" and defend (and if necessary indemnify) the insured once the Stage 1 Primary Insurer's limits were exhausted. After an expedited court trial based on stipulated facts and exhibits, the trial court ruled that because there was still "primary coverage available" to the insured in the form of the Stage 4 Primary Insurer's policies, the Stage 1 Umbrella Insurer was not obligated to provide a defense.

## III. THE POLICIES[8]

### A. The Stage 4 Primary Insurer

Whatever else the Stage 4 Primary Insurer's policies provide, they provide no coverage for "occurrences" *not* within the Stage 4 Primary Insurer's policy

---

[8] Since there is no issue as to notice or emphasis, in quoting policy language we will change any words in all capitals to normal capitalization.

period, here from March 1, 2001, through March 1, 2003. The policy language is: "This insurance applies to . . . 'property damage' only if: [¶] . . . [¶] (2) The . . . 'property damage' occurs during the 'policy period'."

The Stage 4 Primary Insurer's policies were also clearly commercial general liability (CGL) policies, a fact also stipulated to by the parties. That is, the policies contained a typical CGL insuring clause.[9] Accordingly, the premiums for the two Stage 4 policies were costly, respectively $315,000 and $356,500 for the two successive policies.

And, by the same token, the policies were also clear—in their "other insurance" clauses—that they were "primary" policies. Here is the language: "If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of this policy, our obligations are limited as follows: [¶] a. Primary Insurance [¶] *This insurance is primary except when there is other insurance applying on a primary basis.* Then b. below applies. [¶] b. Excess Insurance [¶] This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis. [¶] When this insurance is excess, we will have no duty to defend any claim or 'suit' that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. [¶] When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of [¶] (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and [¶] (2) The total of all deductible and self-insured amounts under any other insurance." (Italics added.)

As to the self-insured retention endorsement, it began with language that "This endorsement modifies insurance provided under the: Commercial General Liability Coverage Part," then provided a schedule showing that the retention was $25,000 "Per Occurrence," but "$N/A Per Claim" and "Aggregate $N/A." The insured was also required to notify the insurer if there was "potential penetration" of the retention at "50 % of self insured retention."

---

[9] "We will pay those sums that the insured becomes legally obligated to pay as 'damages' because of 'bodily injury' and 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those 'damages,' and we will pay all 'covered expenses' we incur with respect to such 'suit,' up to the limits of insurance. . . . [¶] This insurance applies to 'bodily injury' and 'property damage' only if: [¶] (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and [¶] (2) The 'bodily injury' or 'property damage' occurs during the 'policy period.' "

The text that followed the schedule was clear that the insured was responsible for *defense* costs, as well as indemnity costs, up to the retention amount of $25,000 (hence it was truly a "self-insured retention" as distinct from a "deductible"[10]). The "Self Insured Retention Endorsement (Defense Costs Included)" began with a schedule listing $25,000 "Per Occurrence" as the self-insured retention amount, and underneath the schedule provided: "If a Per Occurrence 'self insured retention' amount is shown in the Schedule of this endorsement, you shall be responsible for payment of all damages and 'defense costs' for each 'occurrence' or offense, until you have paid 'self insured retention' amounts and 'defense costs' equal to the Per Occurrence amount shown in the Schedule, subject to the provisions of A. 3. below, if applicable. [A. 3 below involved aggregate self-insured retention, which, on this insured's schedule, was specifically not applicable.] The Per Occurrence amount is the most you will pay for 'self insured retention' amounts and 'defense costs' arising out of any one 'occurrence' or offense, regardless of the number of persons or organizations making claims or bringing suits because of the 'occurrence' or offense." Thus, after the $25,000 was exhausted, the Stage 4 Primary Insurer was obligated to defend.

One of the facts to which the parties stipulated was that the insured's defense costs in the underlying suit "currently exceeds $25,000."

### B.   The Stage 1 Umbrella Insurer

There is no argument that the Stage 1 Umbrella Insurer's policies were "primary" policies. They weren't. In comparison with the $315,000 annual premiums paid by the insured for the Stage 4 Primary Insurer's policy, the cost of the two Stage 1 Umbrella Insurer's policies was (even for the mid-1990's) a relatively cheap $20,067 and $27,389 a year respectively for the years 1995 and 1996.

The Stage 1 Umbrella Insurer's policies had an "Other Insurance" clause which makes its insurance excess over *any* unexhausted primary policies otherwise providing coverage to the insured, regardless of whether they are listed on the umbrella carrier's schedule of underlying insurance. Here is the entire "other insurance" clause from the policy: "Whenever you are covered by other: [¶] a. primary [¶] b. excess; or c. excess-contingent [¶] insurance

---

[10] *General Star Nat. Ins. Corp. v. World Oil Co.* (C.D.Cal. 1997) 973 F.Supp. 943, 949, has noted that while there "is no dispositive case law differentiating deductibles from SIRs," a deductible "usually relates only to the damages sustained by the insured, not to defense costs" where an "SIR is generally a specific amount of loss that is not covered by the policy but instead must be borne by the insured." (*Id.* at pp. 948–949.)

not scheduled on this policy as 'scheduled underlying insurance', this policy shall apply only in excess of, and will not contribute with, such other insurance. This policy shall not be subject to terms, conditions or limitations of other insurance. In the event of payment under this policy where you are covered by such other insurance, we shall be subrogated to all of your rights of recovery against such other insurance and you shall execute and deliver instruments and papers, including assignment of rights, and do what is necessary to secure such rights."

The Stage 1 Primary Insurer was indeed listed on the schedule of underlying insurance in the two policies in the record.

Another section of the policies dealt with "Defense Payment and Related Duties" which further bore on the issue of the policies' interactions with other policies. We will call this clause the "defense clause" because it fastened an obligation onto the insurer given the circumstance of exhaustion by all primary insurers. The defense clause read in pertinent part: "1. If a claim or 'suit' alleges damages covered by underlying policies and the obligation of all 'underlying insurers' either to: [¶] a. investigate and defend the insured; or [¶] b. pay the costs of such investigation and defense; [¶] ceases solely through the exhaustion of all underlying limits of liability through payment of a combination of covered expenses, settlements or judgments for 'incidents' taking place during our policy period, then we will either: [¶] a. assume the investigation and defense of the insured against 'suits' seeking damages; or [¶] b. if we elect not to assume the investigation and defense in 1.a. above, we will reimburse the insured for reasonable defense costs and expenses incurred with our written consent. . . . [¶] 2. We will investigate and defend 'suits' brought against an insured for a claim or 'suit' that alleges damages from an 'incident' not covered under: [¶] a. 'scheduled underlying insurance'; and [¶] b. 'unscheduled underlying insurance'; [¶] but which seeks damages arising out of an 'incident' otherwise covered by this policy. . . ."

The Stage 1 Umbrella Insurer's policies also defined "underlying insurer" this way: " 'Underlying insurer' means an insurer whose policy covers an 'incident' also covered by this policy but does not include insurers whose policies were purchased specifically to be in excess of this policy. It includes all insurers providing: [¶] a. 'unscheduled underlying insurance'; and [¶] b. 'scheduled underlying insurance.' "

The policies further defined "Unscheduled underlying insurance" this way: "a. 'Unscheduled underlying insurance' means insurance policies available to

an insured, whether: [¶] (1) primary; [¶] (2) excess; [¶] (3) excess-contingent; or [¶] (4) otherwise; [¶] except the policies listed in the Schedule of Underlying Insurance. [¶] b. 'Unscheduled underlying insurance' does not include insurance purchased specifically to be in excess of this policy."

## IV.  ANALYSIS

### ·A.   The Policy Period Problem

The main focus of the insured's briefing involves the logical implications of the "policy period" language in the Stage 4 Primary Insurer's policy. Here is the logic:

(1) The underlying case involved "continuing" property damage that spanned the policy periods of four insurers, from 1995 to at least the time of the lawsuit in 2002.

(2) There is no question that the Stage 4 Primary Insurer's policies do not cover liability for property damage outside its policy period, i.e., the period before March 1, 2001 (which, we might add, constitutes the lion's share of the time on the risk).

(3) By definition, the continuing loss encompassed a period clearly not covered by any of the Stage 4 Primary Insurer's policies (i.e., all the damage for which the insured was alleged to be responsible that occurred before the Stage 4 Primary Insurer came on the risk).

(4) Therefore, there was—given the insolvencies of the Stage 2 and 3 Primary Insurers and the exhaustion of the Stage 1 Primary Insurer's policies—no coverage at all for whatever quantum of property damage or (to use Justice Baxter's phrase from *Montrose II*) "increment of harm"[11] that might be ascribed to the loss period prior to March 1, 2001, when the Stage 4 Primary Insurer came on the risk.

(5) Therefore, there was thus at least *some* damage for which the insured was being sued that was not even potentially covered by the Stage 4 Primary Insurer's policy.

(6) And, since there was no coverage *at all* for that increment of harm, it follows that the Stage 1 Umbrella Insurer's other insurance exclusion was *not* implicated: There was—to track the language of that clause—no "other primary insurance" to cover those increments of harm.

---

[11] See footnote 4, *ante.*

(7) Ergo, the Stage 1 Umbrella Insurer was obligated to drop down and defend the underlying suit.

The insured's argument is not without considerable force. No court could, in good conscience given the unambiguous language of the Stage 4 Primary Insurer's "policy period" language, say there was even potential coverage for the insured's liability for property damage that occurred in the period 1995 through 1996 (the Stage 1 Umbrella Insurer's period), or, for that matter, any property damage that occurred prior to March 1, 2001.

■ But there is a core flaw in the logic. It confuses the obligation of the Stage 4 Primary Insurer to indemnify—which is indeed limited only to that increment of harm *after* March 1, 2001—with the obligation of the Stage 4 Primary Insurer to defend a suit that *includes* an increment of harm after March 1, 2001. If the Stage 4 Primary Insurer had any defense duty *at all* to defend the underlying lawsuit against the insured—say, because of the potential for coverage raised by post-March 1, 2001 damage—then it had a duty to defend the *entirety* of that underlying lawsuit, including that portion of the underlying lawsuit asserting claims for damage occurring *before* March 1, 2001. As the Supreme Court explained in *Buss v. Superior Court, supra*, 16 Cal.4th at page 49, an insurer must defend an entire action when there is at least one claim that is potentially covered—including the balance of the action, which may press claims that are not even potentially covered.[12]

To be sure, the *Buss* case involved an underlying "mixed action," which included *claims* both potentially and not potentially covered, and therefore the insurer had a duty to defend "entirely." (Accord, *Horace Mann. Ins. Co. v. Barbara B*. (1993) 4 Cal.4th 1076, 1084 [17 Cal.Rptr.2d 210, 846 P.2d 792] ["Since an insurer has a duty to defend the entire third party action if any claim encompassed within it potentially may be covered (absent allocation, as noted above), the mere fact that Horace Mann could not indemnify Lee for the molestation did not eliminate its duty to defend other, possibly covered claims."]; *Presley Homes, Inc. v. American States Ins. Co.* (2001) 90 Cal.App.4th 571, 577 [108 Cal.Rptr.2d 686] [complete defense required even though framing issues involving work of additional insureds could be easily paid for separately].)

However, after *Buss*, our high court decided *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38 [70 Cal.Rptr.2d 118, 948 P.2d

---

[12] "To defend meaningfully, the insurer must defend immediately. [Citation.] To defend immediately, it must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not." (*Buss v. Superior Court, supra*, 16 Cal.4th at p. 49.)

909], which did involve damage stretched across policy periods, and *Aerojet-General* held that one insurer's duty to defend extended to underlying actions where damage putatively occurred during some other insurer's policy period. (See *id.* at pp. 71–72.)

Yet there is one more wrinkle to the problem. In articulating the principle as to *time*, as distinct from *covered claims*, the *Aerojet-General* court framed the rule as to an insurer's duty to defend an action alleging continuous damage extending beyond its policy period in terms of time forward, not time past.

The relevant passages are worth quoting in the text here, because it shows that the high court was choosing its words carefully, so as to keep the issue open for another day: "Generally, the insurers assume that their contractual duty to defend is limited to only that part of a 'mixed' claim that comes within a policy period because specified harm may possibly have been caused by an included occurrence therein. They are wrong. As explained above, the duty to defend embraces all the parts of such a claim in which some such harm may possibly have resulted, whether within the policy period *or beyond*. [¶] . . . [¶] It bears repeating: If specified harm may possibly have been caused by an included occurrence and may possibly have resulted, *at least in part, within the policy period*, the duty to defend perdures to all points of time at which some such harm may possibly have resulted *thereafter*. [¶] . . . [¶] . . . Its [Transport Indemnity's] duty to defend was triggered when specified harm was possibly caused by an included occurrence, because at least some such harm may possibly have resulted within the policy period in the first year. It *extended* to all specified harm that was possibly caused by an included occurrence, even if some such harm may possibly have resulted *beyond the policy period* in the *succeeding* 29 years." (*Aerojet-General Corp., supra*, 17 Cal.4th at pp. 71, 72–73, 75, italics added.)

To give an example: If Insurer A's policy period extended from, say, 1970 to 1973, and there was an action against its insured alleging continuous property damage that took place over the years 1971 through 1986, Insurer A would have a duty to defend the entire action. (Assuming, of course, that there was not some other basis that would relieve Insurer A of its duty to defend even for damages that were alleged to have occurred in the period 1970 through 1973.) Our case, by contrast, is like one where the action against the insured alleged continuous property damage that took place in the period 1966 through 1971. Does this twist make a difference?

While we don't have a Supreme Court case on point, a couple of decisions of the Court of Appeal indicate that the requirement to defend "entirely"

extends even to underlying actions where the continuous property damage happens before the policy period.

First there is an observation from *Haskel, Inc. v. Superior Court* (1995) 33 Cal.App.4th 963 [39 Cal.Rptr.2d 520]. There, an insurer's unilateral attempt to only pay for a 13 percent share of a total defense burden—the 13 percent being calculated as that insurer's pro rata share of its time on the risk of a continuing loss—was treated as the functional equivalent of a total denial and also rejected. (*Id.* at p. 976, fn. 9.) The court observed that *Barbara B.* meant that once there was "any defense burden" at all, that burden must be "fully borne," with "allocations of that burden among other responsible parties to be determined later." (*Ibid.*)

Second, and more directly on point, is *State of California v. Pacific Indemnity Co., supra,* 63 Cal.App.4th at pages 1545–1548, which rejected the notion of restricting an insurer's defense obligation to just an amount pro rated based on its time on the risk. The *State of California v. Pacific Indemnity* case is particularly instructive in regards to the case before us because it involved allegations of underlying continuing damage that continued on for 43 years—1947 until 1990.[13] The insured had elected to "self-insure" for all but one of the 43 years of continuing damage, and that year was September 1963 through September 1964—that is, about 16 years of continuing property damage had elapsed *before* the insurer's policy period (making it similar to the present case in that respect). But it made no difference. The insurer may have been on the risk for one year but it was required to provide the entire defense.

Here is the key passage from *State of California v. Pacific Indemnity*: "The comprehensive general liability insurance policy in this case covered property damage, and Pacific Indemnity does not dispute that at least some of the claims were potentially covered. This triggered Pacific Indemnity's contractual duty to defend claims potentially covered. (*Buss [v. Superior Court], supra,* 16 Cal.4th at p. 46.) Its *prophylactic* duty required it to defend the entire action, even if not all claims were potentially covered. (*Id.* at pp. 48–49.) Pacific Indemnity's argument that its duty to defend should be apportioned with its insured based on the one year of its coverage is contrary to California law." (*State of California v. Pacific Indemnity Co., supra,* 63 Cal.App.4th at p. 1548.)

---

[13] Ironically, the underlying suit began when the insured filed an action based on the discharge of pollutants, but the insured soon found itself a cross-defendant when various defendants sued it for contribution for the same continuing damage.

We see nothing in *State of California v. Pacific Indemnity* (or the *Haskel* observation) to justify departing from the rule they articulate (or at least adumbrate). The main possible conceptual objection to a common law rule[14] that obligates a defending insurer to defend "entirely," even though there are damages not even potentially covered because they occurred prior to the policy period, is the loss-in-progress rule (see Ins. Code, § 22). There is a discussion of the loss-in-progress rule in *Montrose II, supra*, 10 Cal.4th at pages 689 through 693, and that discussion (relying on § 250 of the Ins. Code) makes it clear that it is enough that the damage be unknown, as distinct from already existent but unknown.[15]

Indeed, the facts of *Montrose II* apply at least equally to the case before us, if not a fortiori. There, the insured even received a potentially responsible person letter from the EPA (Environmental Protection Agency) indicating that the insured might be held liable for cleanup costs *before* the inception of the insurer's policy (*Montrose II, supra*, 10 Cal.4th at p. 690), and that fact still did not "bar potential coverage, or relieve [the insurer] of its duty to defend" under the policies it had issued (*id.* at p. 693). In the present case, there has been no assertion that the insured had any knowledge at all of the underlying lawsuit that would be filed in June 2002, much less a letter from a public agency telling it that it could be sued as a "responsible party."

The *Montrose II* court also noted that since the insurer's policies "did not purport to cover damage or injury that occurred prior to the time those policies went into effect" (*Montrose II, supra*, 10 Cal.4th at p. 691), the "existence and extent" of "prospective injuries were clearly unknown and contingent" from the insured's viewpoint at the time it first purchased its policies from the insurer (*ibid.*). The same thing could be said in the case before us: The existence and extent of the post-March 2001 damages were readily "unknown and contingent" from the insured's viewpoint at the time it purchased the policies from the Stage 4 Primary Insurer.

We need only add, by way of strengthening our resolve to follow *State of California v. Pacific Indemnity*, that *Buss* has already solved the essential problem of the potential for *inequity* when a common law duty to defend entirely collides with contract language clearly precluding any coverage for property damage outside of the policy period (and doubly so for any property

---

[14] One must keep in mind that a key part of the rationale in *Buss* was that the requirement to defend entirely was "law-imposed" as distinct from "contract-imposed." (See *Buss v. Superior Court, supra*, 16 Cal.4th at pp. 48–49.)

[15] Thus answering Bishop Berkeley's famous conundrum concerning falling trees, forests and sound, in the negative, at least in the context of insurance law.

damage occurring *before* the policy period). The inequity arises because the law gives the insured something the insured didn't pay for—a defense of claims never even potentially covered. (See *Buss v. Superior Court, supra,* 16 Cal.4th at p. 48.) The solution, said the *Buss* court, is allowing the insurer's right to seek reimbursement if the insured is willing to run the necessary gauntlet of preservation of that right.

(This is not an insurer-seeking-reimbursement-from-the-insured case, so we need not detail just exactly what might be required for a successful insurer reimbursement action here. Thus we do not comment on any potential *Buss* action brought by the Stage 4 Primary Insurer against the insured for reimbursement for money spent defending damage claims that were never even potentially covered. Nor do we comment on the ensuing question of whether, in such a hypothetical reimbursement action, the insured might have a valid claim for indemnity or reimbursement from the Stage 1 Umbrella Insurer.[16])

*Buss* made clear that the insurer can seek reimbursement for money spent on claims never even potentially covered, and we see no reason the same rule should not apply for money spent on damages never even potentially covered (assuming, for sake of argument, that defense costs for such damages could be segregated out). Both never-even-potentially-covered *claims* and never-even-potentially-covered *damages* are equally uncovered. The insurer's duty to defend the entirety of a lawsuit including such claims or damages is equally a matter of a "prophylactic" common law rule aimed at protecting the insured because the insured is entitled to an immediate and meaningful defense. (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 49.)

All of which is by way of saying that there was indeed primary insurance available to the insured as regards the *defense* of the underlying suit from the Stage 4 Primary Insurer, even though there was an increment of harm claimed in the suit that was not even potentially covered by the Stage 4 Primary Insurer's policy. There being such primary insurance available, there would be no *defense* obligation triggered by the Stage 1 Umbrella Insurer's "defense" clause, while its "other insurance" affirmatively relieved it of any obligation to defend.

---

[16] On the other hand, by holding that the Stage 4 Primary Insurer had a duty to defend the underlying suit and its policy had to be exhausted before the Stage 1 Umbrella Insurer had to drop down and defend that suit, we probably *are* saying something about a "hypothetical" equitable contribution action by the Stage 4 Primary Insurer against the Stage 1 Umbrella Insurer. Then again, come to think of it, this case would merely be stealth contribution litigation by other means if it turned out that the Stage 4 Primary Insurer was really paying to press this action against the Stage 1 Umbrella Insurer—after all, the insured received a proper defense from the Stage 4 Primary Insurer—but that's only speculation on this record.

## B. The Self-insured Retention Problem

The $25,000 self-insured retention in the Stage 4 Primary Insurer's policy, however, presents conceptually a somewhat more difficult problem as to the obligations of the Stage 1 Umbrella Insurer under the circumstances of this case. Consider the following syllogism:

(1) We know, from *Aerojet-General*, that self-insurance is not "insurance." (See *Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th at p. 72, fn. 20.)[17] And while *Aerojet-General* cautioned readers that nothing it was saying was "contrary" to the rule that "an 'excess insurer' does not have a duty to defend an insured until 'primary insurance' in the form of a so-called 'self-insured retention' is exhausted" (*id.* at pp. 72–73, fn. 21), the two appellate cases that the court cited for that proposition, *Nabisco, Inc. v. Transport Indemnity Co.* (1983) 143 Cal.App.3d 831 [192 Cal.Rptr. 207] and *City of Oxnard v. Twin City Fire Ins. Co.* (1995) 37 Cal.App.4th 1072 [44 Cal.Rptr.2d 177], are distinguishable from the case before us.[18] No case has

---

[17] For the eight-year period 1976 through 1984, the insured in *Aerojet-General* had what were are known as "fronting" policies, which really appear to be form of suretyship or bonding rather than insurance. Fronting policies of the kind described in *Aerojet-General* guarantee the claims of injured third parties with the insured being liable to the fronting insurer for reimbursement of anything it might pay out by way of both indemnification and defense. (See *Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th at pp. 49–50 & fn. 3; see also *Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 471 [282 Cal.Rptr. 389] [observing that a " 'fronting policy' " is "a policy which does not indemnify the insured but which is issued to satisfy financial responsibility laws of various states by guaranteeing to third persons who are injured that their claims . . . will be paid" and further describing such a policy as "a surety instrument."].) One of the major points of the *Aerojet-General* opinion is that the eight-year period of fronting policies did not make the insured liable to its various primary insurers for contribution to its own defense. As the court put it in the cited footnote, "In a strict sense, 'self-insurance' is a 'misnomer.' . . . If insurance requires an undertaking by one to indemnify *another,* it cannot be satisfied by a self-contradictory undertaking by one to indemnify *oneself.*" (*Aerojet-General, supra,* 17 Cal.4th at p. 72, fn. 20, original italics.) (Not all justices of the *Aerojet-General* court agreed, however. (See *Aerojet-General, supra,* 17 Cal.4th at p. 89 (conc. & dis. opn. of Chin, J.) ["By adopting this insurance plan, Aerojet made a deliberate decision to assume its own defense costs in exchange for a reduction in premium costs. Indeed, during the eight-year period Aerojet contracted to pay its own defense costs, it was, in essence, acting as its own insurer for that purpose"].))

[18] In *Nabisco,* there was a primary policy which expressly made its coverage excess "if 'there is other insurance or self-insurance.' " (*Nabisco, Inc. v. Transport Indemnity Co., supra,* 143 Cal.App.3d at p. 834.) The court rejected the idea that the reference to "self-insurance" created an ambiguity obligating the policy to otherwise defend or indemnify. The court said: "Nabisco cannot seriously claim it had a reasonable expectation of general coverage under the Transport policy [with the excess to 'self-insurance' clause]. It made a risk management

yet *held* that an excess insurer with an "other insurance" clause that does not include a specific reference to self-insurance has no duty to drop down until the self-insured retention and any primary insurance overlying that self-insured retention is exhausted.

(2) The "other insurance" clause of the Stage 1 Umbrella Insurer's policy operates, by its terms, only when there is other "insurance." ("Whenever you are covered by other: . . . *insurance* not scheduled on this policy as 'scheduled underlying insurance', this policy shall apply only in excess . . . ." [Italics added.].)

(3) From the viewpoint of the insured, the Stage 4 Primary Insurer's self-insured retention clause did *not* provide for a "first-dollar" defense obligation. That is, the Stage 4 Primary Insurer was not responsible for anything until the $25,000 retention was reached (indeed, the schedule required the insured to warn the insurer when expenses reached the halfway mark). In other words, for the first $25,000, the insured really had no "insurance" from the Stage 4 Primary Insurer.[19]

(4) Since the insured had no *other* "insurance" for the first $25,000 of the claim against it, the Stage 1 Umbrella Insurer's "other insurance" clause could not operate to make it excess of the Stage 4 Primary Insurer at least as to that amount. It was obligated to defend with dollar one—there being, after all, no "other insurance" to pay dollars one through 25,000.[20]

---

decision not to buy coverage for the first $50,000." (*Id.* at p. 836.) Here, however, the Stage 1 Umbrella Insurer's other insurance contains no reference to "self-insurance," only three kinds of "insurance."

The *City of Oxnard* case did not involve excess or umbrella policies as such—that is, the two policies at issue there weren't resting on top of a primary policy. Rather, they were resting on top of a specific self-insured retention, and were excess in the sense that "coverage was only available after Oxnard [the insured] became legally obligated for a loss in excess of its retained limit or SIR." (*City of Oxnard v. Twin City Fire Ins. Co., supra*, 37 Cal.App.4th at p. 1075.) The appellate court simply held there was no duty to defend or indemnify where the *self-insured retention was not exceeded*, even though the underlying action had the "potential" to exceed the limit. (See *id.* at p. 1075.)

[19] A point emphasized by the result in the *City of Oxnard* case, and which also distinguishes the case before us from *Montgomery Ward & Co. v. Imperial Casualty & Indemnity Co.* (2000) 81 Cal.App.4th 356 [97 Cal.Rptr.2d 44]. There, to be true, the court held that a particular primary insurer—which in this case would be the analog of the Stage 4 Primary Insurer—did indeed have a duty to defend even though there was a self-insured retention. *But*—that particular primary insurer's policy apparently contemplated a "first dollar" defense obligation despite the self-insured retention, which is not the case with the Stage 4 Primary Insurer here.

[20] In supplemental briefing, the insured describes the possibility of an excess drop-down for the limited space of zero to $25,000 (because "there is no other primary insurance at that level") as a "fallback argument."

The flaw in this logic is the assumption that the self-insured retention can be meaningfully separated from the Stage 4 Primary Insurer's policy, *of which it is a creature*, for purposes of the Stage 1 Umbrella Insurer's "other insurance" clause. In classic insurance law terms, treating the self-insured retention as a separate entity from the Stage 4 Primary Insurer's policy defeats the reasonable expectations of all the parties, including the insured. It obliterates the distinction between primary and excess insurance.

We first off note the temporal anomaly that such parsing creates. An earlier excess insurer would have a duty to "drop down" and defend a claim "beneath" the coverage of a later primary. That's counterintuitive, to say the least.

We have already noted the great disparity in the premiums charged by the Stage 4 Primary Insurer and the Stage 1 Umbrella Insurer. The yearly premiums charged by the former were no less than *12 to 15 times* the yearly premiums charged by the latter. A primary policy imposes on an insurer a "primary duty of defense" while an excess (or "secondary" or "umbrella") policy attaches only after primary coverage has been exhausted; hence the latter is cheaper. (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597–598 & 598, fn. 2 [178 Cal.Rptr. 908]; see also *Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 365 [165 Cal.Rptr. 799, 612 P.2d 889] [noting premium differences between excess and primary coverages].) A primary policy can fund a long war of attrition. By contrast, defense obligations of an excess policy are far less likely to be triggered, and that improbability is reflected in a cheaper premium.

But even more fundamentally bearing on the reasonable expectations of the parties, treating a self-insured retention lying "beneath" a primary policy as a period of "noninsurance" for purposes of whether an earlier excess policy is triggered in a continuing loss scenario, is to ignore the terms and expectations of the "overlying" primary policy.

The self-insured retention was part and parcel of the Stage 4 Primary Insurer's policies. As alluded to above, the self-insured retention is *itself* a creature of the primary policy. The Stage 4 Primary Insurer's policy announced that it was, under normal circumstances, a primary policy and would interact with other policies *as* a primary policy ("This insurance is primary except when *there is other insurance applying on a primary basis*" [italics added]). Further, the self-insured retention endorsement was, by its terms, a modification of what would otherwise be covered under the primary policy. ("This endorsement *modifies insurance provided* under the: Commercial

General Liability Coverage Part." [Italics added.]) The linkage between the primary insurance and the endorsement meant that it was not a case of the Stage 4 Primary Insurer's coverage springing to life, fully born, at the $25,000 level. In the same vein, the Stage 4 Primary Insurer retained the right to step in and *settle* litigation *within* the retention. (See *New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 507 [80 Cal.Rptr.2d 286] [allowing primary insurer to settle a case within a deductible because "Any other rule would mean that the insurer, while required to defend the claims because of 'potential' coverage, must do so without being able to rely upon the policy's express settlement provisions."].)

If the insured wanted to go without any insurance post-March 2001 (we will avoid the "misnomer" of "self-insure"), the insured could simply have "gone bare" and not purchased any, primary or otherwise. Such a decision, of course, would have exposed the insured's own assets to claims that otherwise might have been insured against except in cases of continuing loss, but that would be in accord with the essential deal between it and the excess insurer (in light of the rule articulated in *Montrose II*): If the insured *was* truly bare and a claim was otherwise potentially covered by the excess policy, the excess *would* drop down and cover it. Then again, the Stage 1 Umbrella Insurer had essentially bet, back in 1995 and 1996, that the insured would not make any such decision precisely because it would mean exposure of the insured's own assets to *most* claims, even if the odd continuous damage claim might entail a defense obligation on its part.[21]

■ In sum, *Aerojet-General*'s statement that: "an 'excess insurer' does not have a duty to defend an insured until 'primary insurance' in the form of a so-called 'self-insured retention' is exhausted" (*Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th at pp. 72–73, fn. 21) applies here. The statement obtains with just as much force even if the excess insurer's "other insurance" clause does not contain a direct reference to "self-insurance" (cf. *Nabisco, Inc. v. Transport Indemnity Co., supra,* 143 Cal.App.3d at p. 834).

---

[21] A corollary to the point that the self-insured retention is part and parcel of the later primary insurer's policy is that the danger of an insured being able to "game" coverage from an earlier excess insurer by the simple expedient of having an SIR in a later primary policy is eliminated. The basic need of the insured to obtain a primary policy for most risks (which, after all, are of a noncontinuous nature) means that excess insurer could reasonably anticipate that the insured would continue to obtain primary coverage in the future. If the insured really wanted to "game" coverage from an earlier excess insurer, it would have to brave a multitude of other risks.

## V.  DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

Rylaarsdam, J., and Fybel, J., concurred.