[No. F016343. Fifth Dist. Feb. 5, 1993.]

CENTURY INDEMNITY COMPANY, Cross-complainant and Respondent, v.
LONDON UNDERWRITERS, Cross-defendant and Appellant.

## COUNSEL

King, Macleod, Alford & Morey, Donald F. Morey and William H. King for Cross-defendant and Appellant.

Barger & Wolen, William A. Kurlander and Larry M. Golub for Cross-complainant and Respondent.

## OPINION

**ARDAIZ, Acting P. J.**—This case presents the following question. When a primary insurer pays $500,000 of its insured's $1.1 million settlement of a claim against the insured, and when the insured's excess insurer pays the remaining $600,000 of the claim, and when the insured recovers indemnification of $500,000 from a third party, which of the two insurers is entitled to be reimbursed with the $500,000 received from the third party?[1] Or do the two insurers receive pro rata shares of that $500,000? We hold that, on the facts of this case, the trial court's judgment awarding the $500,000 to the excess insurer was correct.

A more detailed account of the facts leading up to the judgment is as follows.

On August 19, 1985, Donald T. Wells was electrocuted while working as an employee of Cates Transportation, Inc. (hereinafter Cates) on a worksite operated by Montgomery Drilling Company (hereinafter Montgomery). Cates was a subcontractor of Montgomery. Wells's heirs brought a suit for wrongful death (hereinafter the Wells action) against Montgomery and others.

Prior to the electrocution of Wells, Montgomery had acquired two policies of insurance, both of which were in force and effect at the time of the electrocution. One was a primary policy issued by appellant London Underwriters (hereinafter London) with limits of $500,000. The other was a policy

---

[1]Some of the dollar figures just stated have been rounded off for convenience of discussion. As is pointed out in the text of the opinion and in footnote 3, *post*, the primary insurer (London) appears to have paid $476,548.46 to the claimant (the Wells heirs) on behalf of its insured (Montgomery), and to have also paid $28,451.54 defending against that claim, for a total payout of $505,000 on behalf of its insured. The excess insurer (Century) paid $604,100 to the claimant, so that the settlement received by the claimant (the Wells heirs) appears to have been $1,080,648.46 (consisting of $476,548.46 paid by the primary insurer plus $604,100 paid by the excess insurer).

written by respondent Century Indemnity Company (hereinafter Century) with limits of $5 million in excess of $500,000 for each occurrence.

Also, prior to the electrocution of Wells, Cates and Montgomery had entered into a written agreement called a "Master Service Contract" under which Cates was performing work as Montgomery's subcontractor. The Master Service Contract required Cates to defend and indemnify Montgomery for certain losses, including incidents such as the death of Wells, and to maintain insurance with a minimum of $500,000 in coverage. It also required Cates to name Montgomery as an additional insured under the insurance to be maintained by Cates. Cates did not in fact, however, name Montgomery as an additional insured.[2]

London, as primary insurer for Montgomery, provided Montgomery with a defense to the Wells action. In March of 1987, the plaintiffs in the Wells action made a demand for settlement in the amount of $1,250,000.

On September 26, 1987, Montgomery filed a declaratory relief action against Cates. Montgomery's action sought a declaration that the Montgomery-Cates Master Service Contract requires Cates to defend and indemnify Montgomery with respect to the claims made by the Wells heirs in the Wells action.

In October of 1987, Montgomery entered into an agreement with the Wells heirs. Under the terms of this agreement, Montgomery's primary insurer (London) paid its policy limits amount of $500,000 to the Wells heirs, and the Wells heirs agreed not to execute against any of the assets of Montgomery, except to the extent of other insurance available to Montgomery to indemnify it for the injuries claimed by reason of the death of Wells.[3] After the above described October 1987 agreement and the exhaustion of London's $500,000 policy limit, Century assumed the defense of Montgomery in the Wells action. Montgomery's declaratory relief action against Cates was continued by London, which claimed to be the subrogee of Montgomery.

In January of 1988, Century sought and was granted leave to intervene in the declaratory relief action, and Century filed its complaint-in-intervention

---

[2] But Cates did obtain the insurance. It was issued by Lexington Insurance Company.

[3] This matter was tried on stipulated facts, one of which was that London paid to the Wells heirs "the amount remaining in its $500,000 policy after deduction of defense costs (which are included as part of the policy limits), and in addition paid Montgomery's $5,000 deductible obligation, for a total payment by London of $505,000." London states in its opening brief that the amount actually paid by London to the Wells heirs, after deduction of the defense costs, was $476,548.46. See also footnote 1, *ante*. The important point is simply that London paid out the full $500,000 limit of its policy of primary insurance insuring Montgomery.

on or about January 21, 1988. Century's complaint-in-intervention sought a declaration that any moneys paid by Cates or its insurers should be used to pay the claims of the Wells heirs against Montgomery, which claims were not satisfied by Montgomery's October 1987 agreement with the Wells heirs. On February 11, 1988, London filed its answer to the complaint-in-intervention and joined Century in its request for judicial determination of the rights of Century and London as to the moneys to be received from Cates or its insurers.

On June 14, 1988, Century and Montgomery negotiated a full and complete settlement of the claims in the Wells action. Century paid $604,100 to the Wells heirs in the form of a cash payment and structured settlement. This $604,100 was in addition to the money previously paid by London to the Wells heirs. All defendants in the Wells action, including Montgomery, were dismissed with prejudice.

Cates has stipulated that there is $500,000 available, under Cates's liability insurance, to be paid to or for the benefit of Montgomery in settlement of Cates's obligation, pursuant to Cates's Master Service Contract with Montgomery, to indemnify Montgomery for amounts paid by or on behalf of Montgomery to the Wells heirs. London and Century refer to this $500,000 as the "Cates money." Cates has agreed to pay the $500,000 of Cates money to either London or Century as the appropriate court may direct.

London contended, and still contends, that it is entitled to reimbursement in full from the Cates money for its $500,000 payment to the Wells heirs. Century contended, and still contends, that Century is entitled to reimbursement with the $500,000 of Cates money for Century's payment of more than $600,000 to the Wells heirs.

On August 5, 1988, the trial court, apparently unaware of the June 1988 settlement of the Wells action, entered its judgment on the declaratory relief action. It ruled that there be no reimbursement to London unless the claims of the Wells heirs settled for an amount less than the combined limits of the London policy ($500,000) and the Cates money (also $500,000). Because the Wells heirs received a total of more than $1 million in settlement of the Wells action, London got none of the Cates money.

London appealed. This court, in an unpublished opinion filed on November 27, 1989, agreed with London's contention that London had been denied due process because the trial court had "treated the Cates contribution as insurance" and had "in essence deemed Century an excess carrier not only to the London policy but also to the '$500,000 Cates insurance coverage'"

without giving London and Century an opportunity to address the issue of whether the Cates money could properly be so characterized. In reversing the trial court's judgment and remanding, we stated:

"We do not conclude the court was precluded, as a matter of law, from treating the Cates contribution as primary insurance. Rather, we conclude it was inappropriate for the court to resolve the matter on an issue neither raised nor argued by the parties without providing an opportunity to address the issue. Accordingly, the matter must be reversed and remanded to allow the parties an opportunity to address the issue of whether the Cates contribution may be properly characterized as some form of primary insurance. If the court concludes the contribution should not be treated as insurance, it should then consider the respective subrogation rights of the parties including whether the contribution should be apportioned between the parties."

Century and London then petitioned the superior court, pursuant to Code of Civil Procedure section 638, for a reference. They stipulated that the court could appoint the Honorable Victor M. Campilongo, Judge (retired), to try all remaining issues in the action. The court so ordered.

Judge Campilongo ruled that the Cates money "is an indemnification fund, and it is not a form of primary insurance."[4] He ruled that Century was entitled to reimbursement from this $500,000 fund (the Cates money). Judgment was entered accordingly.

London has once again appealed.

### LONDON'S CONTENTIONS ON APPEAL

London contends on appeal that (1) because it paid the Wells heirs in October of 1987, before Century paid the Wells heirs in June of 1988, London's right of subrogation "vested" prior to Century's, and London should therefore receive the Cates money; (2) the trial court erred in finding the subrogation clauses in the London and Century policies to be "wholly reconcilable" and erred in giving no effect to the London subrogation clause; and (3) if equity applies to resolve the competing interests of London and Century, the Cates money should be prorated between London and Century.

### DISCUSSION

The parties agree that London was a "primary" insurer of Montgomery. *"Primary* coverage is insurance coverage whereby, *under the terms of*

---

[4]Neither London nor Century challenges, on this appeal, the correctness of this characterization of the Cates money. It is not disputed that the source of the Cates money was the Lexington Insurance Company, which insured Cates and not Montgomery. See footnote 2, *ante.*

*the policy*, liability attaches *immediately* upon the happening of the occurrence that gives rise to liability." (*Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597 [178 Cal.Rptr. 908], italics original.) Similarly, they agree that Century provided "excess" insurance coverage to Montgomery. " '*Excess*' or *secondary* coverage is coverage whereby, *under the terms of the policy*, liability attaches only after a predetermined amount of primary coverage has been exhausted." (*Olympic Ins. Co.* v. *Employers Surplus Ins. Co., supra*, 126 Cal.App.3d at p. 598, italics original, fn. omitted.) "Secondary insurance is sometimes referred to as 'umbrella' insurance."[5] (*Ibid.*) Here, as has been noted above, London's primary policy had limits of $500,000. Century's excess coverage was for amounts in excess of $500,000 with a limit of $5 million.

■ "A subrogation as applied to an insurer is its right to be put in the position of its insured against third parties legally responsible to its insured for the loss which the insurer has both insured and paid." (*Liberty Mut. Fire Ins. Co.* v. *Auto Spring Supply Co.* (1976) 59 Cal.App.3d 860, 864 [131 Cal.Rptr. 211].) In 16 Couch on Insurance Second (2d ed. 1983) section 61:2, the author states:

"The distinction is sometimes made between legal and conventional subrogation, legal subrogation being that which arises by operation of law, while conventional subrogation is that which arises by convention or the contract of the parties.

Otherwise stated, the insurer's right to subrogation may rest either upon the operation of law, upon the fact of payment made by the insurer, or upon

---

[5]The parties to this appeal appear to use the terms "excess" coverage and "umbrella" coverage interchangeably. Simply for the sake of accuracy, we note that umbrella coverage is one of two types of excess coverage: umbrella coverage and "following form" coverage. (1 Cal. Insurance Law & Practice (rev. 1993) § 14.02[3].) The coverage provided by "following form" excess insurance "follows the terms and conditions of the underlying policy." (*Ibid.*) "Umbrella" excess policies "provide coverage in addition to that provided by the underlying insurance." (*Ibid.*) "Because umbrella policies provide coverage for certain losses for which there may be no underlying insurance, they typically also provide for a self-insured retention, often referred to in the umbrella policy as the 'retained limit' or 'retained amount.' In other words, both following form and umbrella excess policies typically provide coverage for losses that are within the scope of losses covered by the underlying policy or policies, but the amount of which exceeds the limits of liability set forth in the underlying insurance. Umbrella policies may also provide coverage for certain losses not covered by underlying insurance in the event the amount of those losses exceeds the specified self-insured retention." (*Ibid.*, fns. omitted.) To put it more simply, "umbrella insurance is only that secondary insurance which provides broader coverage than the underlying insurance." (*Id.* at fn. 13.) For purposes of this case, all that matters is that Century provided excess insurance. It does not matter which kind of excess insurance. We therefore simply use the term "excess" in this opinion.

the contract between the insurer and the insured expressly providing for subrogation. In most instances this distinction has no significance for the same facts which give rise to subrogation by operation of law are ordinarily the same facts which entitle a person to claim the benefit of a contract or convention for subrogation. It is clear that the insurer has the legal right to place subrogation agreements in their policies so long as they do not contravene applicable statues." (16 Couch on Insurance 2d, *supra*, § 61:2 at pp. 75-76, fns. omitted.)[6] Here, both London and Century had contracted with Montgomery for rights of subrogation. London's policy insuring Montgomery contains the following subrogation clause:

"SUBROGATION: The Underwriters shall be subrogated to all rights which the Assured may have against any person or other entity, in respect of any claim or payment made under this Insurance. . . ."

Century's policy contains what Century describes as a "top to bottom" subrogation clause. It calls for reimbursement to itself for amounts it has paid as excess insurance before any primary insurer is reimbursed. The clause states:

"SUBROGATION: Inasmuch as this policy is 'excess coverage,' the insured's right of recovery against any person or other entity cannot be exclusively subrogated to the Company [Century].

"It is therefore agreed that in case of any payment hereunder, the Company will act in concert with all other interests (including the Insured) concerned, in the exercise of such rights of recovery. The apportioning of any amounts which may be so recovered shall follow the principle that any interests (including the Insured) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the Company is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests (including the Insured) of whom this coverage is in excess are entitled to claim the residue, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the Insured) concerned, in the ratio of their respective recoveries as finally settled."

---

[6] In accord, though perhaps not quite so well stated, is *Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632, 638 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813], where the court states: "Subrogation is of two sorts: 'legal' and 'conventional.' Legal subrogation has its source in equity and arises by operation of law. [Citation.] Conventional subrogation arises by act of the parties and rests on contract. [Citation.]" See also *Knight* v. *Alefosio* (1984) 158 Cal.App.3d 716 [205 Cal.Rptr. 42], where the court points out that "legal" subrogation is also sometimes referred to as "equitable" subrogation (even though they are the same thing), and that "conventional" subrogation is also sometimes referred to as "contractual" subrogation. (*Id.* at p. 723.) As is pointed out in the text of our opinion, both London and Century contracted with their insured (Montgomery) for their respective rights to subrogation.

When London paid its $500,000 primary insurance limits to the Wells heirs on behalf of London's insured, Montgomery, in October 1987, London became "subrogated to all rights which (Montgomery) may have against" Cates or any other "person or other entity." London's insurance contract with Montgomery so provided. But London did not have any right to be free of, i.e., did not have any right not be to bound by, Montgomery's own agreement with Century.[7] London stood in Montgomery's shoes. Montgomery had agreed with Century that amounts paid by Century as excess insurance would be reimbursed to Century before any amounts paid by any primary insurer would be reimbursed. London, as Montgomery's subrogee, had no greater rights than Montgomery itself and thus was bound by the agreement that London's insured (Montgomery) had made with Century.

We perceive London's contentions in this case as arising from a misperception of the rights London has through Montgomery. Cates, pursuant to the Master Services Contract, owed indemnification to Montgomery. Therefore, when Cates paid $500,000, the money was paid to fulfill Cates's obligation to Montgomery. London, as subrogee, had only gained the rights that Montgomery had. Montgomery had agreed that it would absorb the first $500,000 of any loss, and until it did, Century's excess coverage would not be applicable. Therefore, if the $500,000 of Cates money paid to Montgomery in name were paid to London in fact, the result would be that London would not suffer the $500,000 loss that had to be exceeded in order to trigger the applicability of Century's excess coverage. London agreed to insure that first $500,000 of liability.[8] If Montgomery had had no excess coverage at all, and if Montgomery had paid the rest of the settlement with the Wells heirs

---

[7]This is why London's contention that its right to subrogation "vested" first does not help London. It is not disputed that London paid the Wells heirs before Century did. When London paid its $500,000 policy limit, London did not acquire the right to obtain $500,000 from Cates. It acquired whatever right to the Cates $500,000 that Montgomery had. And Montgomery was bound by Montgomery's own agreement with Century providing that excess insurer Century would be given preference, over any primary insurer, to any available reimbursement from a third party. Montgomery presumably paid less for its excess policy with Century than Montgomery would have paid if Montgomery had not agreed to give preference to Century over primary insurers in obtaining reimbursement from third parties. (Cf. *Olympic, supra*, 126 Cal.App.3d at p. 598, fn. 2.) We therefore need not dwell on whether London's being subrogated to the rights of Montgomery may or may not properly be called a "vesting" of London's "right to subrogation." We do note, however, that London cites no authority that says anything at all about the "vesting" of subrogation rights.

[8]London's primary policy insured Montgomery for "$500,000 any one accident or occurrence." If London were to receive the $500,000 of Cates money as reimbursement for London's payment of $500,000 to the Wells heirs on behalf of Montgomery, London would be in the position of having suffered a net loss of zero even though its insured, Montgomery, suffered a net loss of approximately $600,000 (approximately $1.1 million paid by Montgomery to the Wells heirs, with indemnification from Cates of only $500,000 of that $1.1 million loss).

out of Montgomery's own assets after London had paid the first $500,000, and if the $500,000 of Cates money then became available to indemnify Montgomery, London would not be entitled to take the Cates money, suffer a net loss of zero, and leave its insured to pay a net loss of over $600,000. London stands in no better position now simply because Century, as Montgomery's excess insurer, paid the rest of the settlement to the Wells heirs.

■ The trial judge on remand was therefore correct in determining that the London and Century subrogation clauses "are wholly reconcilable" and in awarding the $500,000 of Cates money to Century, which had paid the Wells heirs more than $600,000. The trial judge on remand did not fail to "give effect" to London's subrogation clause, as London contends. London was one of two subrogees, and was below Century in the order of preference because of nature of the loss Montgomery agreed to absorb (the first $500,000), as well as the order of preference given by Century's "top to bottom" subrogation clause. Had there been more than $604,100 available for reimbursement from Cates (instead of only $500,000), London would have received some reimbursement. That the trial judge did not award any money to London does not mean that he did not "give effect" to the London subrogation clause.

We note, as did the trial judge on remand, that this is the same result that would have been reached if Cates had abided by its Master Service Contract with Montgomery and had named Montgomery as an additional insured on Cates's policy of primary insurance. The Wells heirs could then have gotten $500,000 from London, $500,000 from Cates's insurer, and the remaining $100,000 from Montgomery's excess insurer, Century. The trial judge on remand also expressly stated that "if the subrogation clauses were to be irreconcilable, the Court would have decided the matter on equitable principles and would have come to the same conclusion." But "[c]ontractual terms of insurance coverage are honored whenever possible." (*Olympic. Ins. Co.* v. *Surplus Ins. Co.*, *supra*, 126 Cal.App.3d at p. 599.) We see no reason why the subrogation clause of the Century contract should not be honored.

We also note that the result we reach in this case appears to be in accord with the view expressed in 16 Couch on Insurance Second, *supra*, where the author states at section 61:49, page 133:

"Where the insurers' coverage is in the nature of layers, the excess carriers should recover under subrogation before primary insurers can be reimbursed. One can look at a subrogation recovery as reducing the net loss in which case the excess carriers would not be obligated to pay the loss."

The judgment is affirmed. Costs to respondent.

Dibiaso, J., and Vartabedian, J., concurred.