Filed 3/26/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DEERE & COMPANY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, et al.,<br><br>        Defendants and Respondents. | A145170<br>(San Francisco City & County<br>Super. Ct. No. CGC-03-420927)<br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 25, 2019, and reported in the Official Reports (32 Cal.App.5th 499) be modified as follows:

1.      On page 507, the third sentence of the first paragraph of section II.B., "$1.5 million" is changed to "$2.5 million", so the sentence reads:

> Rather, coverage for products liability was provided by a series of first-layer umbrella policies that provided coverage to Deere in excess of a specific dollar amount (ranging over time from $50,000 to $2.5 million) paid by Deere.

2.      On page 517, in the first full paragraph starting with "Here, unlike the insured in Padilla," the second, third, and fourth sentences of the paragraph are modified to read:

> Rather, once Deere has paid its self-insured retentions under its first-layer umbrella policies and once the first-layer umbrella policies are exhausted, Deere may seek coverage from the higher-layer excess policies. It will be Deere's exhaustion of its SIRs that will trigger coverage under its first-layer

policies.  And, the exhaustion of the first-layer policies is what will trigger coverage under the higher-layer policies.

The remainder of the first full paragraph shall continue without change.


3.     On page 520, in the second full paragraph that starts "Here, the products liability,", the second sentence of the paragraph is modified to read:

> Nothing in the plain language of the excess policies requires a determination that Deere must pay damages (as opposed to obtaining a dismissal without payment) before the insurers are obligated to pay the litigation expenses associated with Deere's defense of the underlying asbestos actions.

The remainder of the second full paragraph shall continue without change.


There is no change in the judgment.


Respondents petition for rehearing is denied.


Dated:_____          _____, Acting P.J.

Trial Court: San Francisco City & County Superior Court

Trial Judge: Hon. Curtis E. A. Karnow

Counsel:

Covington & Burling LLP, Donald W. Brown, Wendy L. Feng for Plaintiff and Appellant.

Kendall Brill & Kelly LLP, Alan Jay Weil, Corey E. Klein; Shipman & Goodwin LLP, James P. Ruggeri; Aiwasian & Associates, Deborah A. Aiwasian, Armen K. Hovannisian; Sinnott, Puebla, Campagne & Curet, APLC, Randolph Sinnott; Tressler LLP, Linda Bondi Morrison, Ryan B. Luther; Law Offices of Brian McClellan, Brian McClellan; Carroll Burdick & McDonough LLP, Robert Binion; Lindsay A. Morgan for Defendants and Respondents.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DEERE & COMPANY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY,<br>et al.,<br><br>    Defendants and Respondents. | A145170<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-03-420927) |

## I.  INTRODUCTION

This insurance coverage dispute arises from numerous claims filed, in various jurisdictions, against plaintiff and appellant Deere & Company (Deere) for personal injuries arising from alleged exposure to asbestos-containing brakes, clutch assemblies, and gaskets used in Deere machines.  Deere filed suit for declaratory relief and breach of contract with respect to over 100 umbrella and excess general liability policies issued to Deere from 1958 through 1986.  Deere sought a declaration of coverage and compensatory damages for breach of contract, claiming that the policies covered the asbestos personal injury claims.  At issue in the current phase of the case, are two issues that proceeded to trial, to wit:  (1) whether the higher-layer excess policies were triggered once the first-layer excess policy limits, which were subject to a self-insured retention (SIR) paid by Deere, had been exhausted; and (2) whether the insurers' indemnity obligation extended to Deere's defense costs incurred in asbestos claims that had been dismissed.

The trial court found in favor of the insurers, concluding that the retained limits Deere agreed to pay in its first layer of coverage also applied to the higher-layer excess

1

policies, such that the higher-layer excess coverage was not triggered until Deere paid additional SIRs per occurrence. The court further concluded that the insurers were not obligated to pay defense costs when underlying cases were dismissed without payment to a claimant either by judgment or settlement. We reverse.

## II. BACKGROUND

### A. *Layered Liability Insurance Coverage*

Before delving into the issues on appeal, it is necessary to provide an overview of some key concepts in multi-layered, complex insurance-coverage disputes. Liability insurance is often purchased in towers (e.g., $1 million primary, $5 million first-level excess, $10 million second-level excess, $20 million third-level excess, and so on), which benefits both the insurer (allocating the risk) and the insured (reducing premium costs). (See 15 Couch on Insurance (3d 2018) § 220:32 Nature of Excess and Umbrella Policies, pp. 220-37–220-38.)

" 'Liability insurance policies often contain a "deductible" or a "self-insured retention" (SIR) requiring the insured to bear a portion of a loss otherwise covered by the policy.' " (*Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466, 1473–1474 (*Forecast Homes*).) " 'The term "retention" (or "retained limit") refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy. It is often referred to as a "self-insured retention" or "SIR." ' " (*Id.* at p. 1474.) Although an SIR is, in some ways, similar to a deductible in an insurance policy, "[u]nlike a deductible, which generally relates only to damages, an SIR also applies to defense costs and settlement of any claim." (*Ibid.*) Another difference is that the SIR does not reduce available policy limits. (Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2018) ¶ 7:384, p. 7A-160.) Rather, the policy limits apply on top of the SIR. (*Ibid.*) For example, if the policy limit is $500,000 and there is a $50,000 SIR, the policy will provide $500,000 coverage once the SIR is satisfied. (*Ibid.*) A $50,000 deductible, however, reduces the $500,000 policy limit, leaving $450,000 after the deductible is satisfied. (*Ibid.*)

In other words, a deductible represents a portion of a covered loss lying *within* the terms of the policy.  (Hermanson, et al., *A FACT OF LIFE Retained Limits, Deductibles, and Self-Insurance* (May 2013) 55 No. D.R.I. for Def. 64, 65.)  Whereas, a retention is the initial portion of a loss that lies *outside* the policy.  (*Ibid.*)  It represents the risk the insured has agreed to retain for itself before coverage is triggered.  (*Ibid.*)  The position of a primary insurer over a self-insured retained limit can be analogized to the position of an excess insurer over a primary policy.  (*Forecast Homes*, *supra*, 181 Cal.App.4th at p. 1474.)  However, "[t]he analogy between 'primary' and 'excess' insurance should not be carried too far."  (Croskey, et al., Cal. Practice Guide:  Insurance Litigation (The Rutter Group 2017) ¶ 7:387, p. 7A-162.)

"The distinction between excess and primary insurers is significant because '[d]ifferent rules govern the obligations of excess and primary insurers.' "  (*Forecast Homes*, *supra*, 181 Cal.App.4th at p. 1474.)  Primary insurance provides immediate coverage upon the happening of an occurrence that gives rise to liability.  (*Century Surety Co. v. United Pacific Ins. Co.* (2003) 109 Cal.App.4th 1246, 1255.)  Excess insurance then pays after the limit of the primary insurance is exhausted.  (*City of Oxnard v. Twin City Fire Ins. Co.* (1995) 37 Cal.App.4th 1072, 1077 (*City of Oxnard*).)  There are two principle types of excess insurance coverage:  "umbrella" coverage and "following form" coverage.  (*Century Indemnity Co. v. London Underwriters* (1993) 12 Cal.App.4th 1701, 1707, fn. 5 (*Century Indemnity*).)  A following form excess policy has the same terms and conditions as the primary policy but has a different liability limit.  (*Coca Cola Bottling Co. v. Columbia Casualty Ins. Co.* (1992) 11 Cal.App.4th 1176, 1182 (*Coca Cola Bottling Co.*).)

" 'Umbrella' excess policies 'provide coverage in addition to that provided by the underlying insurance.' [Citation.]  'Because umbrella policies provide coverage for certain losses for which there may be no underlying insurance, they typically also provide for a self-insured retention, often referred to in the umbrella policy as the "retained limit" or "retained amount."  In other words, both following form and umbrella excess policies typically provide coverage for losses that are within the scope of losses covered by the

underlying policy or policies, but the amount of which exceeds the limits of liability set forth in the underlying insurance.  Umbrella policies may also provide coverage for certain losses not covered by underlying insurance in the event the amount of those losses exceeds the specified self-insured retention.' "  (*Century Indemnity, supra,* 12 Cal.App.4th at p. 1707, fn. 5.)

As one respected insurance treatise cautions, an SIR "is *not* the same as primary insurance for all purposes."  (Croskey, et al., Cal. Practice Guide:  Insurance Litigation, *supra,* ¶ 7:387, p. 7A-162.)  In fact, an SIR or self-insurance "is not insurance at all but rather is the antithesis of insurance; the essence of an insurance contract is the shifting of the risk of loss from the insured to the insurer, while the essence of self-insurance, a term of colloquial currency rather than of precise legal meaning, is the retention of the risk of loss by the one upon whom it is directly imposed by law or contract."  (1A Couch on Ins. (3d ed. 2018) § 10:1, generally, recognition of what is "self-insurance", p. 10-3.)

Properly viewed, a self-insured retention does not constitute insurance. (3 Insurance Claims and Disputes (6th ed. Mar. 2018) Self-insured retention, § 11:31, pp. 11-599, 11-600.)  Rather, the primary insurer's obligations are triggered once the SIR is exhausted, just like an excess insurer's obligations are triggered once the primary limits are exhausted.  (*See City of Oxnard*, *supra*, 37 Cal.App.4th at p. 1077.)  And, an excess insurer's obligations are triggered once both the primary limits and the self-insured retention are exhausted.  (*Id.* at pp. 1077–1078; see also 3 Insurance Claims and Disputes, *supra,* § 11:31, pp. 11-603–11-604.)  In other words, "excess insurance is not reached until the underlying primary insurance is exhausted, and the primary insurance is not even triggered until the self-insured retention is exhausted."  (*Ibid.*)

## B.    *Deere's Tower of Coverage*

Deere, a renowned manufacturer of farm equipment, has a complex, multi-layered tower of coverage.  From 1958 through 1986, Deere's coverage consisted of numerous primary, umbrella, and excess policies.  The primary policies did not cover products-liability claims and, as such, were not implicated in the asbestos claims at issue here. Rather, coverage for products liability was provided by a series of first-layer umbrella

policies that provided coverage to Deere in excess of a specific dollar amount (ranging over time from $50,000 to $1.5 million) paid by Deere. This dollar amount represented the risk Deere retained for itself or its SIR. In this respect, the first-layer umbrella policies sat above Deere's retained limit. The first-layer policies were subject to per-occurrence and aggregate limits. During this same time frame, Deere also purchased and maintained several layers of excess insurance policies, which sat above the first-layer umbrella policy limits.

Thus, in a typical case, Deere's coverage would play out as follows: Upon being sued in a products liability case, Deere would commence its defense, pay its retained limit, and then look to the first layer to provide coverage. The first layer would then pay out its per-occurrence and aggregate limits, and then Deere would look to the next level of coverage and so on and so forth all the way up the tower.

## C.   *The Policies*

Following the last phase of trial, 49 insurance policies remained at issue in this litigation, representing over $200 million in policy limits.[1] For purposes of this appeal, the parties have agreed that any differences in policy language are not material. Thus, we have selected two representative policies, which we quote, in part, below.

### 1.  *First-Layer Umbrella Policies*

The first-layer umbrella policies have the following relevant provisions:[2]

"**I.   COVERAGE**

"Underwriters [will] . . . indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability: -

"(a) imposed upon the Assured by law
                           "or
"(b) assumed . . . by the Named Assured . . . . [¶]

---

[1] We have been informed that additional insurance companies have been dismissed during the pendency of this appeal.

[2] The language in this section is from Lloyd's Policy No. 60188, hereafter referred to as "First-Layer Policy."

"for damages direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of: -

"(i) Personal Injuries . . . . [¶] . . . [¶]

"caused by or arising out of each occurrence happening anywhere in the world.

"**II.    LIMIT OF LIABILITY**

"Underwriters hereon shall only be liable for the ultimate net loss the excess of either: -

"(a) the limits of the underlying insurances . . . in respect of each occurrence covered by said underlying insurances,
                                           "or
"(b) $75,000 [amount SIR varies per policy] ultimate net loss any one occurrence arising out of products liability . . . . [¶] . . .  [¶]

"(hereinafter called the 'underlying limits",
and then only up to a further $1,000,000 [varies per policy] in all in respect of each occurrence – subject to a limit of $1,000,000 [varies per policy] in the aggregate for each annual period during the currency of this policy, separately in respect [to] products liability and in respect of personal injury . . . . [¶]

        "In the event of reduction or exhaustion of the aggregate limits of liability under the said underlying insurances by reasons of losses paid thereunder, this policy shall :-

"(1) in the event of reduction pay the excess of the reduced underlying limit

"(2) in the event of exhaustion continue in force as underlying insurance. [¶] . . .[¶]

**"DEFINITIONS**:[¶] . . . [¶]

 "5.  OCCURRENCE –

        "The term 'occurrence' wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury . . . during the policy period. [¶] . . .  [¶]

"6.  ULTIMATE NET LOSS –

6

"The term 'ultimate net loss' shall mean the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury . . . either through adjudication or compromise, and shall also include . . . all sums paid as . . . expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . . [¶] . . . [¶]

"**CONDITIONS** [¶] . . . [¶]

"G.  ASSISTANCE AND CO-OPERATION –

"The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured . . . . [¶] . . . [¶]

"I.  LOSS PAYABLE –

"Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of each such occurrence.  The Assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by agreement of the Assured, the claimant, and Underwriters.  [¶]  Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy."[3]

*2.  Higher-layer Following Form Excess Policies*

As noted, Deere also maintained several layers of excess umbrella liability insurance policies, which by their terms cover any "ultimate net loss" in excess of the underlying limits of the first-layer umbrella policies.  In any given policy period, there were anywhere from two to five or more layers of such excess coverage.  The upper layers were following form policies; they were generally short, consisting of one or two

---

[3]  First-Layer Policy.

7

pages that incorporate by reference the underlying policy coverages, except for the premium; the liability limits; and as otherwise provided therein.

The higher-layer excess policies have the following relevant provisions:[4]

"1. COVERAGE.

"The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obliged to pay by reason of the liability imposed upon the Insured by law, or assumed under contract or agreement by the Named Insured for damages, direct or consequential [,] and expenses on account of:

"(a) Personal injuries, including death . . . . [¶] . . . [¶]

"caused by or arising out of each occurrence happening anywhere in the world, and arising out of the hazards covered by and as defined in the Underlying Umbrella Policies stated below and issued by the 'Underlying Umbrella Insurers'. [¶] . . . [¶]

"2. LIMIT OF LIABILITY – UNDERLYING LIMITS
"It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows [amounts vary per policy]:

"(a)    $10,000,000        Ultimate net loss in respect of each occurrence, but

"(b)    $10,000,000        in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability. . . . [¶]

"and the Company shall then be liability to pay only the excess thereof up to a further

"(c)    $1,000,000 P/O     ultimate net loss in all respect of each occurrence –
        20,000,000         subject to a limit of

"(d)    $1,000,000 P/O     in the aggregate for each annual period during the
        20,000,000         currency of this policy, separately in respect of Product
                           Liability. . . . [¶] . . . [¶]
                      "CONDITIONS[¶] . . . [¶]

"2. MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE –

---

[4] The language in this section is from the First State Insurance Excess Umbrella Policy No. 920013, hereafter referred to as "Higher-Layer Policy."

"This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in the Insuring Agreement . . . prior to the happening of an occurrence for which claim is made hereunder.

"It is a condition of this Policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy or by the operation of Condition of the Underlying Umbrella Policies."[5]

## D.    *Proceedings in the Trial Court*

This coverage dispute proceeded to trial in three phases, which occurred between 2006 and 2013.  Although the instant appeal is limited to issues arising in phase III, we briefly discuss the prior rulings.  Following phase I, the trial court ruled that where multiple excess policies covering one occurrence that do not provide that SIRs constitute primary or "other insurance," "then the SIR requirement for each is satisfied when the amount thereof has been satisfied by Deere once for the occurrence."  In other words, Deere was not required to horizontally exhaust[6] all SIRs for all successive policy years for an injury occurring across multiple policy years, unless a particular excess policy recited that the SIRs were to be treated as primary or "other insurance."  Instead, Deere could select the SIRs in any manner it chose (vertical exhaustion), so long as all such policies were relative to a triggered occurrence.  As to its primary insurance coverage, Deere was required to horizontally exhaust all triggered policies before any excess policies would be required to respond.  Finally, Deere was permitted to "stack" policy

---

[5]  Higher-Layer Policy.

[6]  In continuous loss cases, such as the one on appeal, the issue of vertical versus horizontal exhaustion arises when several primary policies or lower-level excess policies are triggered, courts must determine whether the limits of the underlying policies are for one year ("vertical") or all years ("horizontal") and must be exhausted before a particular excess policy must pay.  (4 Thomas & Abramovsky, New Appleman on Insurance (Law Library Ed. 2009) 2017 § 24:06[3][a], pp. 24–69.)

limits.  In other words, if Deere had $1 million in policy limits for three successive policy years, and an occurrence triggered coverage over all three years, Deere would be entitled to recover $3 million instead of $1 million.

In phase II, the trial court ruled that based on the policy language, Deere was required to pay an SIR for each "occurrence."  The term "occurrence" as used in the excess policies from 1961 to 1986 (other than certain Travelers policies) meant "all exposure of a single claimant to asbestos during the policy period."  Under such excess policies, the number of occurrences was deemed to be "the number of claimants asserting injury from a single, continuous or repeated exposure to asbestos during the policy period, except if more than one claimant is exposed to the same conditions at the same premises location, then all such exposures at that premises and under those conditions constitute a single 'occurrence.' "

In phase III, the trial court addressed two additional legal issues:  (1) Once the first-layer excess policy's annual aggregate limit for products liability has been exhausted, are the higher-layer excess insurers' policies subject to a self-insured retention per occurrence for *subsequent claims*?; and (2) must insurers that issued insurance policies containing an obligation to pay or reimburse defense costs indemnify Deere for defense costs incurred in asbestos claims that are *dismissed without payment* to the claimant (either through a judgment or settlement)?

The trial court found in favor of the insurers on both issues, concluding that the retained limits Deere agreed to pay in its first layer of coverage also applied to the higher-layer excess policies, such that the higher-layer excess coverage was not triggered until Deere paid additional SIRs per occurrence.  The court further concluded that the insurers were not obligated to pay defense costs when the underlying cases were dismissed without payment to a claimant.

The instant appeal followed.

### III.  DISCUSSION

#### A.    *Standard of Review*

10

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) But, "to the extent the trial court had to review evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] will review such factual findings under a substantial evidence standard." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.)

We apply well-settled rules to the trial court's interpretation of the policy. "Interpretation of an insurance policy is primarily a judicial function. When the trial court's interpretation did not depend upon conflicting extrinsic evidence, the reviewing court makes its own independent determination of the policy's meaning." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 35 (*Armstrong*).) " ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." ' " (*Powerine Oil Co. Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 (*Powerine*); accord, *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27.)

"Words in an insurance policy are to be interpreted as a layperson would interpret them, in their ' "ordinary and popular sense." ' [Citations.] . . . [¶] If particular policy language is ambiguous, it is to be resolved by interpreting the ambiguous provisions in accordance with the insured's objectively reasonable expectations." (*Armstrong, supra,* 45 Cal.App.4th at p. 36.)

Whether policy language is ambiguous is a question of law that we review de novo. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245.) "A policy provision [is] ambiguous when it is capable of two or more constructions, both of which are reasonable." (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648.)

"The nature of a policyholder's 'reasonable expectation of coverage' is also a question of law." (*Fresh Express Inc. v. Beazley Syndicate 2623/623 at Lloyd's* (2011) 199 Cal.App.4th 1038, 1053.) In determining the objectively reasonable expectations of the insured, "the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265, italics omitted.) " 'Courts will not strain to create an ambiguity where none exists.' [Citation.] ' " ' "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage " ' " ' " (*Palp, Inc. v. Williamsburg National Ins.* (2011) 200 Cal.App.4th 282, 290.)

## B. *The Retained Limits Are Not Incorporated into the Higher-layer Excess Policies*

There appears to be no serious argument that the usual function of a "follows form" clause in an excess policy is to provide coverage for the same acts or occurrences as the underlying policy. Rather, the parties dispute whether the SIR applies only in the first layer of coverage or whether it continues to apply in each of the higher layers. At issue is the extent to which the "following form" provision incorporates the terms of the underlying policies.

"A 'following form' policy incorporates the terms and conditions of another carrier's policy and *provides the same scope of coverage* as the underlying policy." (*Qualcomm, Inc. v. Certain Underwriters at Lloyds, London* (2008) 161 Cal.App.4th 184, 189, fn. 2, italics added.) The scope of coverage provided is generally subject to the same conditions and limitations of the underlying primary policy, *with the exception of the policy limits.* (*Coca Cola Bottling Co., supra,* 11 Cal.App.4th at p. 1183.)

Here, the trial court concluded the SIRs were *not limits of liability*, and as such

attached to the higher-layer policies through their "following form" provisions set forth in their "Maintenance of Underlying Umbrella Insurance" clauses, which exclude, as relevant here, "the amount and limits of liability." However, later, the trial court posits that if the "limits of liability," which were "excepted from inclusion into the higher layers," implied that that the underlying limits need not have been expended or exhausted . . . *And if the SIR is defined as part of the underlying limit, as it is, then the SIR too is part of the . . . 'terms, definitions, exclusions and conditions' and are not excluded by the parenthetical exclusion* (except as regards to the . . . limits of liability . . .)" in the following form provision. (Italics added.)

Rather than trying to unravel this enigmatic reasoning, we reframe the question as whether coverage under the higher-layer excess polices is triggered *after* the aggregate underlying limits have been satisfied—without Deere paying additional SIRs for subsequent claims submitted. The plain language of the first-layer umbrella policies and the higher-layer excess policies makes clear that Deere has no obligation to pay additional retained limits once the aggregate limits of the underlying policies have been satisfied. Section two of the higher-layers policies is entitled "Limit of Liability— Underlying Limits" and provides that the only precondition to liability attaching to the higher-layers policies is that the "Underlying Umbrella Insurers have paid or been held liable to pay the full amount of their respective ultimate net loss liability" of $10 million (varies per policy) per occurrence, but $10 million (varies per policy ) in the aggregate. It further states that the higher-layer insurer "shall then be liable to pay only the excess thereof . . . ." This section says nothing about higher-layer excess coverage being conditioned on Deere paying any additional SIR or retained limit before liability attaches. Moreover, there is no language in this provision that justifies treating Deere as an Underlying Umbrella Insurer or treating the retained limits in the underlying policies as "insurance" for this purpose. (See *Montgomery Ward & Co., Inc. v. Imperial Casualty & Indemnity Co.* (2000) 81 Cal.App.4th 356, 365–367.)

Seeking to avoid this language, the higher-layer insurers rely on the "following form" provision in the Maintenance Underlying Umbrella Insurance clause. However,

that provision explicitly excludes terms relating to "the amount and limits of liability." This means that the higher-layer policies do not incorporate section II of the underlying policies, entitled "Limit of Liability," which includes the amount and limits of the underlying policies, as well as Deere's retained limit. A "policy limit" or "limit of liability" "is the maximum amount the insurer is obligated to pay in contract benefits on a covered loss." (Croskey, et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 3:64, pp. 3–14; *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1127–1128 ["limit of liability" meant "the *most* the policy will pay"].)

The reference to "limit of liability" in the underlying policies means the first-layer insurers' limits—"[we will] only be liable for the ultimate net loss the *excess* of either . . . [¶] . . . the limits of the underlying insurances . . . in respect of each occurrence covered by said underlying insurances, [¶] or [¶] . . . $75,000 [amount of SIR varies per policy] ultimate net loss for any one occurrence arising out of products liability . . . [¶] . . . [¶] and then only up to a further $1,000,000 . . . [per] occurrence—subject to a limit of $1,000,000 in the aggregate . . . ."[7]

Because the policy language is clear and unambiguous, it must be interpreted according to its plain meaning. (*Powerine, supra,* 37 Cal.4th at p. 390.) The first-layer policies are invoked only after the applicable SIR has been paid by Deere. And the higher-layer policies are triggered once both the underlying limits, of which the SIRs are a part, have been exhausted. This conclusion is reinforced by the fundamental purpose of excess insurance—which is to protect the insured against amounts of loss or damage in excess of the underlying policy's limits. (See *North Carolina Ins. Guar. Ass'n. v. Century Indem. Co.* (N.C. Ct.App. 1994) 444 S.E.2d 464, 470.) That the following-form excess policy excludes the underlying policy limits is entirely consistent with this purpose.

By definition, excess insurance attaches only after a predetermined amount of underlying coverage has been exhausted. (*Bailey v. State Farm Fire & Casualty*

---

[7] First-Layer Policy, italics added.

14

*Co.* (Ill. Ct. App. 1994) 642 N.E.2d 1323, 1326.) "In other words, excess insurance contracts do not respond to losses unless and until there has been full and proper exhaustion of primary insurance, SIRs, and underlying excess insurance." (Seaman & Kittredge, *Excess Liability Insurance: Law and Litigation* (1997) 32 Tort. & Ins. L.J. 653, 672.) As a hypothetical, assume that a certain first-layer policy provides coverage to Deere in excess of $5,000 (SIR) and up to $200,000, with a $20,000 per occurrence limit; the second layer would kick in once the $200,000 had been expended. Assume further, that numerous claims have been lodged against Deere. For each claim, Deere pays $5,000, with the first layer paying $20,000 per occurrence. After 10 claims, the first layer's $200,000 aggregate limit would be exhausted, and the aggregate limits of the higher excess policies would be triggered. The issue is whether for the eleventh claim Deere must pay another $5,000 before the higher levels are triggered. The answer to this question is no.

*Padilla Construction Co., Inc. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984 (*Padilla*), though not directly on point, is instructive. In *Padilla*, the court addressed the implications of an "other insurance" clause within the meaning of an excess insurer's policy when the lone defending primary insurer's policy contained a self-insured retention. (*Id.* at p. 988.) There, the insured elected not to seek coverage under a primary policy with a $25,000 SIR and proceeded to seek coverage under its umbrella policies. (*Id.* at p. 991.) The court rejected the notion that the insured had no insurance for the first $25,000 of liability, such that the umbrella carrier was obligated to drop down. (*Id.* at pp. 988–989.) In so holding, the court explained: "The flaw in this logic is the assumption that the self-insured retention can be meaningfully separated from the [primary insurer's] policy, *of which it is a creature,* for purposes of the [excess insurer's] 'other insurance' clause. In classic insurance law terms, treating the self-insured retention as a separate entity from the [primary] policy defeats the reasonable expectations of all the parties, including the insured. It obliterates the distinction between primary and excess insurance." (*Id*. at p. 1003.) "Reasonable insureds don't expect to receive a defense from a typically much cheaper excess policy unless all the

expensive primary insurance they bought has been exhausted." (*Id.* at p. 989.)
Describing the self-insured retention as "part and parcel" of the primary policy, the
court, citing *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38,
72–73, footnote 21, concluded that: " 'an "excess insurer" does not have a duty to
defend an insured until "primary insurance" in the form of so-called "self-insured
retention" is exhausted.' " (*Padilla*, at p. 1004.)

Here, unlike the insured in *Padilla*, Deere is not seeking to avoid its SIR
obligations. Rather, Deere has paid its self-insured retentions under its first-layer
umbrella policies, which have been exhausted, and is now seeking coverage from the
higher-layer excess policies. It was Deere's exhaustion of its SIRs that triggered
coverage under its first-layer policies. And, the exhaustion of the first-layer policies is
what triggered coverage under the higher-layer policies. Continually requiring Deere to
pay SIRs for each successive layer would have the effect of affording Deere far less
coverage than it had purchased. The higher-layer policies, as discussed, follow form
*except*, as relevant here, regarding limits of liability. Thus, the higher-layer policies do
not follow form as to the SIRs, which are written in terms of liability limits. The SIR is
properly classified as a limit of liability, providing further support to the finding that the
follow-form clause incorporates the scope (i.e., products liability coverage) of the first-
layer policies but not the monetary caps on liability provided in the Limits of Liability
section.

*In re Silicone Implant Ins. Coverage Litigation* (Minn. Ct. App. 2002) 652 N.W.2d
46 (affd. in part & revd. in part on other grounds, (Minn. 2003) 667 N.W.2d 405),
although involving deductibles, as opposed to SIRs, further informs our decision. There,
excess insurers brought an action against a manufacturer of silicone breast implants for
declaratory relief. Among many issues raised on appeal, was whether the trial court had
erred in concluding that the $5,000 deductible in a primary policy did not survive the
exhaustion of the primary policy. (*Id.* at p. 56.) There, as here, the excess policies
followed form *except* regarding the limits of liability. (*Id.* at p. 63.) Because the

16

deductible endorsements (like the SIRs here) were written in terms of liability limits, the excess policies did not follow form as to the deductible endorsement.  (*Id.* at p. 68.)

We see no basis in the insurance contracts, or in applicable law, from which to conclude that Deere's SIR obligations survived the exhaustion of first layer of coverage and were incorporated into the higher-layer insurance policies.  To summarize, the higher-layer excess policies follow form except, as is relevant here, regarding the limits of liability.  Accordingly, the higher-layer excess policies do not follow form as to the SIR, which is written in terms of liability limits.

### C.    *The Policies Obligate the Insurers to Indemnify Deere for Its Defense Costs*

Deere argues that it was entitled to indemnification of its defense costs, specifically its legal fees, without regard to the outcome in the underlying case.  The higher-layer insurers contend that payment of defense costs is subject to an "adjudication or compromise" requirement that is missing when Deere prevails and the underlying action is dismissed without any payment by Deere.  This argument is irreconcilable with the plain language of the policies.

The insurers agreed to indemnify Deere "for all sums" Deere becomes obligated to pay "by reason of the liability: [¶] (a) imposed . . . by law [¶] or [¶] (b) assumed under contract or agreement by [Deere] [¶] . . . [¶] for **damages,** direct or consequential **and expenses,** all as more fully defined by the term 'ultimate net loss' on account of: [¶] (i) Personal injuries [¶] . . . [¶] caused by or arising out of each occurrence . . . ."[8]

The policies typically define "ultimate net loss" as "the total sum" which Deere becomes "**obligated to pay** by reason of personal injury, property damage or advertising liability claims, **either through adjudication or compromise** *and* shall also include . . . all sums paid as . . . **expenses** for doctors, lawyers, nurses and investigators and other

---

[8] First-Layer Policy, bold emphasis added.

persons, and **for all litigation, settlement, adjustment and investigation of claims and suits** which are **paid as a consequence of any occurrence covered hereunder** . . . ."[9]

The policy provisions consistently differentiate between damages and expenses. The insuring agreement distinguishes between Deere's obligation to pay for damages and expenses, which are both further defined in the "ultimate net loss" provision. The "ultimate net loss" provision structurally consists of two provisions: damages on the one hand, which arise through "adjudication and compromise" of Deere's liability and expenses on the other, which are paid in connection with "litigation . . . of claims and suits." Payment of expenses, unlike damages, does not require a determination of Deere's liability.

The insurers' argument regarding the meaning of "occurrence covered hereunder" does not alter our conclusion. After an extended discussion charging Deere with mistakenly applying the duty to defend standard to the indemnity policies, the insurers argue that "occurrence covered hereunder" does not mean "a claim that *might* result in indemnity; rather, it means an occurrence that *does* result in indemnity, a claim that is actually covered." Basic rules of contract interpretation expose the flaw in the insurers' position.

We need not repeat in detail the principles of contract interpretation, which are set out in part III.A *ante*, but simply reiterate that under those rules, words in an insurance policy are to be interpreted in the ordinary and popular sense. The word "covered" as used in insurance policies connotes " 'inclusion within *the scope of an insurance policy . . . .*' " (*Wells Fargo Bank v. California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 948 (*Wells Fargo*).) "Coverage is the *totality of risks* contained in a contract whereby an insurer undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (1 California In. Law Dict. & Desk Ref. (2017 ed.) p. 1490.) Take for example an automobile insurance policy,

---

[9] First-Layer Policy, bold emphasis added.

18

damages arising from a traffic accident would be within the scope of the policy, but earthquake damages would not be among the risks covered by the automobile policy.

This interpretation of "covered" is consistent with California case law. In *Wells Fargo, supra,* 38 Cal.App.4th 936, the court rejected an insured's argument that, based on a perceived ambiguity in the terms "covered" and "not covered," an umbrella insurer was required to provide drop down coverage upon the insolvency of its primary insurer. (*Id.* at pp. 948–949.) Concluding the term "covered" was not ambiguous, the court looked to Webster's Dictionary, which defined "the verb 'cover' as 'to have sufficient *scope* to include or take into account,' and the noun 'coverage' to mean 'inclusion within *the scope* of an insurance policy or protective plan." (*Wells Fargo,* at p. 948.) Thus, the court explained that "a layperson would have understood the phrases 'covered by said underlying insurance' and 'not covered by said underlying insurance' as referring to the *scope* of the underlying insurance. That is, a layperson would understand that a claim is 'covered by underlying insurance' if it falls within the scope of coverage of that insurance, and is 'not covered by underlying insurance' if it falls outside the scope of insurance coverage." (*Id.* at pp. 948–949; see also *Housing Group v. California Ins. Guarantee Assn.* (1996) 47 Cal.App.4th 528, 531–532 [interpreting the phrase "a loss which is covered" to include a loss within the *scope* of policy].)

In *Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1709 (*Ticor*), we addressed the meaning "coverage" in the context of determining whether an excess insurer had a duty to defend when the primary insurer refused tender of the claim. Under the challenged policy, the duty to defend arose when there was "a claim for damages for an occurrence under the policy and 'no defense coverage is provided by underlying insurance.' " (*Id.* at p. 1709, italics omitted.) The insured argued that since the primary insurer did not act to defend it in the underlying, there was no underlying defense coverage. (*Ibid.*) Rejecting that contention, we explained that irrespective of whether the primary insurer actually paid the defense obligations, as long as such costs were the type payable by the primary policy, there was no duty to defend under the excess policy. (*Ibid.*) "In the context of an insurance policy, coverage means

19

'inclusion within the scope of an insurance policy,' not 'the act or fact of covering.' Thus 'coverage' has nothing to do with how, in reality, the insurer acts with respect to its insurance obligations." (*Ibid.*)

Here, the products-liability lawsuits filed against Deere, claiming personal injuries caused by continuous or repeated exposure to asbestos, fall squarely within the scope of coverage afforded by the excess policies; indeed, the asbestos suits are precisely the sort of products-liability claims the policies were designed to encompass. Nothing in the plain language of the excess policies requires a coverage determination regarding Deere's actual liability, before the insurers are obligated to pay the litigation expenses associated in Deere's defense of the underlying actions. Two additional policy provisions support this interpretation.

The policies contain a "notice of occurrence" condition, which typically requires that "whenever [Deere] has **information** from which [Deere] may reasonably conclude that an **occurrence covered hereunder** involves injuries or damages which, **in the event that [Deere]** *should* **be held liable**, is likely to involve this policy, or which shall otherwise result in a claim under this policy, notice shall be sent to [the insurer] as soon as practicable . . . ."[10]

The plain language of this provision reinforces the interpretation that a "covered occurrence" is one arising within the scope of the insurance, as opposed to an actual adjudication of the merits of an underlying claim. This provision directs Deere to provide notice "as soon as practicable" of the "likel[ihood]" it could be liable for injuries or damages involving the policy. In other words, Deere is required to provide notification of an occurrence within the scope of the policy, *before* any determination of liability. Thus, "occurrence covered hereunder", as used in the "ultimate net loss" definition, retains the same meaning when used in the "notice of occurrence" condition: in both provisions, an "occurrence covered hereunder" is an occurrence of the type

---

[10]  First-Layer Policy, bold emphasis added.

covered by the policy, irrespective of whether Deere is actually liable to pay damages in the underlying action.

This interpretation is further bolstered by the "loss payable" condition. A typical "loss payable" condition provides: "[Deere] shall make a definite claim for any loss for which the [insurers] **may be liable** under the policy within twelve (12) months **after** [Deere] shall have **paid an amount of ultimate net loss** in excess of the amount borne by [Deere] **or after** [Deere's] **liability shall have been fixed** and rendered certain either by final judgment against [Deere] after actual trial or by agreement of [Deere], the claimant, and [insurers] . . . Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy."[11]  This provision contemplates two scenarios in which Deere must file a claim:  1) after paying an amount exceeding its SIR or 2) after its liability had been fixed by judgment or agreement. Because claims are to be submitted by Deere either when paid *or* after final judgment, the policies cannot be interpreted as requiring a finding of liability before Deere is entitled to its defense costs. At minimum, the "ultimate net loss" provision, when read in context with the "loss payable" provision, could be viewed as ambiguous to the extent it is capable of two or more constructions, both of which are reasonable. (*MacKinnon v. Truck Ins. Exchange*, *supra,* 31 Cal.4th at p. 648.)  As the insurers created any such ambiguity, the provisions are read in favor of Deere in order to protect its reasonable expectation of reimbursement of its defense costs. (*Palp, Inc. v. Williamsburg National Ins., supra,* 200 Cal.App.4th at p. 290.)

Taking a different position, the insurers argue Deere's request for defense costs regardless of the outcome of the underlying suit amounts to the imposition of a duty to defend, a duty the higher-layer excess policies do not contain. We have no quarrel with the basic assertion that the excess insurers' duty to indemnify Deere is not as broad as the duty to defend owed by a primary insurer. To conclude otherwise would be contrary to black-letter insurance law. (See *Buss v. Superior Court* (1997) 16 Cal.4th 35, 46.)  The

---

[11]  First-Layer Policy, bold emphasis added.

21

excess insurers, however, are not being asked to step in and defend Deere against any claim that is potentially covered. In this regard, the insurers' reliance on *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132 (*FMC*), is misplaced.

In *FMC,* the insured (FMC Corporation) contended that umbrella liability-insurance policies issued by London Market Insurers, which included the same definition of "ultimate net loss" used in Deere's policies, obligated the insurers to pay defense costs *at the time defense costs were incurred* rather than once the underlying claim against the insured was resolved. (*FMC, supra,* 61 Cal.App.4th at p. 1199.) FMC Corporation primarily argued it was entitled to its defense costs by analogizing it policies to those containing a duty to defend. (*Ibid.*) FMC Corporation also claimed that the insurer's acknowledged obligation to reimburse defense costs required them to pay such costs as soon as FMC Corporation incurred them for "any claim even potentially covered by the policies." (*Id.* at p. 1200.) The first point—which the court described as the "crux" of FMC's argument (*id*. at p. 1200) does not apply here, for Deere has not asserted that the policies at issue contain "duty to defend" clauses and does not seek to avail itself of the "potentiality" standard associated with the duty to defend. As to the second point, the court rejected FMC's argument that the policies' "Loss Payable" condition (also the same as Deere's) raised an "implication" that the insurers "would be obliged to pay on any claim which [the insured] might make, within twelve months, for reimbursement for having paid 'an amount of ultimate net loss in excess of the [SIR] amount.' " (*FMC, supra,* at p. 1201.) Without any analysis, the court summarily rejected this argument, noting that "ultimate net loss" was defined in relevant part as amounts " 'paid as a consequence of any occurrence covered hereunder' [and] [p]atently the determination whether a particular occurrence is 'covered hereunder' cannot be made until the claim against the insured has been resolved by adjudication or settlement . . . ." (*Ibid.*) Missing from *FMC* is any discussion of the meaning of "cover[age]", which we find is the sine qua non for interpreting the policies in this case. For these reasons, we find *FMC* is inapposite to the resolution of the issues raised in the instant appeal.

Finally, even assuming for the sake of argument that "ultimate net loss" does require "adjudication or compromise" before defense costs are owed—an interpretation we reject—nothing in the policy language requires such a determination to be *adverse* to Deere. "Adjudication" reasonably could encompass a final judgment in favor of Deere, and "compromise" could include a plaintiff's agreement to dismiss his or her claim. Moreover, settlements can, and often do, result in a payment of damages without an admission of liability. Thus, as used in the challenged policies, the provisions requiring "adjudication or compromise" are ambiguous in this case. (*E.M.M.I., Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.) In light of the aforementioned interpretation of "occurrence covered hereunder," it was objectively reasonable for Deere to expect that it would reimbursed for its defense costs incurred in defending itself in the underlying asbestos actions regardless of whether it prevailed in the underlying litigation. Consistent with these reasonable expectations, the ambiguous provisions are resolved in Deere's favor. (*Id.* at pp. 470–471.)

Accordingly, we conclude that the excess policies obligate the excess insurers to indemnify Deere for its defense costs in the underlying cases, irrespective of whether those cases have been resolved by adjudication or settlement.

## IV. DISPOSITION

The judgment is reversed. Deere is entitled to costs on appeal.

_____
REARDON, J. [*]

We concur:


_____
STREETER, Acting P. J.


_____
TUCHER, J.


[*] Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24

A145170, *Deere & Company v. Allstate Insurance Company*

Trial Court:   San Francisco City & County Superior Court

Trial Judge:   Hon. Curtis E. A. Karnow

Counsel:

Covington & Burling LLP, Donald W. Brown, Wendy L. Feng for Plaintiff and Appellant.

Kendall Brill & Kelly LLP, Alan Jay Weil, Corey E. Klein; Shipman & Goodwin LLP, James P. Ruggeri; Aiwasian & Associates, Deborah A. Aiwasian, Armen K. Hovannisian; Sinnott, Puebla, Campagne & Curet, APLC, Randolph Sinnott; Tressler LLP, Linda Bondi Morrison, Ryan B. Luther; Law Offices of Brian McClellan, Brian McClellan; Carroll Burdick & McDonough LLP, Robert Binion; Lindsay A. Morgan for Defendants and Respondents.