Filed 7/13/20

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| SANTAFE BRAUN, INC.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>INSURANCE COMPANY OF NORTH AMERICA et al.,<br><br>    Defendants and Appellants. | A151428<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC04428686) |

In this action, SantaFe Braun, Inc. (Braun), formerly known as C.F. Braun & Co., seeks coverage for numerous asbestos-related claims under various excess insurance policies. In phased proceedings lasting over 10 years, the trial court entered judgment in favor of the excess insurers based on Braun's failure to establish that the primary and, in some cases, underlying layers of excess insurance had been exhausted.[1]

On appeal, Braun challenges the trial court's interpretation of the policies as requiring exhaustion of all underlying layers of insurance (horizontal exhaustion) rather than exhaustion of only those policies specified in each policy (vertical exhaustion). Braun also contends the trial court abused its discretion in refusing to consider additional evidence of exhaustion presented almost four years after the evidentiary phase of the trial was completed.

---

[1] The excess insurers remaining in the litigation on appeal are, TIG Insurance Company, United States Fire Insurance Company, Associated International Insurance Company, Everest reinsurance Company, Allianz Underwriters Insurance Company, First State Insurance Company, New England Reinsurance Company Corporation, Insurance Corporation of New York, Pennsylvania Lumbermans Mutual Insurance Company, Progressive Casualty Insurance Company, Ranger Insurance Company, Republic Insurance Company and Houston General Insurance Company.

After briefing was complete, the Supreme Court decided *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215 (*Montrose III*),[2] in which the court addressed the sequence in which the insured could access its excess insurance policies for coverage of claims for continuous environmental damage caused between 1947 and 1982. Interpreting the language of the excess policies before it, the court in *Montrose III* held the insured "is entitled to access otherwise available coverage under any excess policy once it has exhausted directly underlying excess policies for the same policy period." (*Id*. at p. 222.) We requested and have received supplemental briefing addressing the effect of the Supreme Court's decision on the present appeal.

We now conclude, based on the reasoning in *Montrose III,* that the trial court erred in interpreting the policies at issue in this case to require horizontal exhaustion of all primary and underlying excess insurance coverage before accessing coverage under the excess policies at issue. We also conclude that the trial court abused its discretion in refusing to consider Braun's new evidence of exhaustion. Accordingly, we shall reverse the judgment and remand for further proceedings.

## Background

For the relevant time period, Braun had primary general liability insurance coverage from three companies and multiple layers of excess insurance above the primary insurance. In 1992, when asbestos-related claims were first filed against Braun, Braun tendered its defense to its primary insurers. In August 1998, the primary insurers entered into a written agreement with Braun under which the underlying claims would continue to be defended and settled while the primary insurers resolved allocation arrangements among themselves.

In February 2004, Braun filed the present declaratory relief action. Among other things, Braun sought a declaration that its excess insurers "are obligated to pay the costs

---

[2] The Supreme Court's decision is the third in the Montrose action. We refer to the most recent decision as *Montrose III* to be consistent with the short forms used frequently to describe the *Montrose* decisions.

and expenses—including without limitation the costs of investigation, defense, settlement, and judgment—arising from or in connection with the present and future" "bodily injury lawsuits" alleging "injurious exposure to certain materials at oil refineries constructed, serviced and/or maintained by Santa Fe Braun."

In 2006 and 2007, the primary insurers entered into an agreement pursuant to which they each paid the limits of their polices into a trust, which would continue to pay defense costs and claims on behalf of Braun. Subsequently, certain excess insurers settled the present action and made contributions to the trust.

The court conducted the trial in phases. Phase I involved an excess insurer no longer at issue in this case. Phase II concerned eight first-level excess policies issued between 1961 and 1973 and from 1979 to 1981 by the London Market Insurers (London), Stonewall Insurance Company, and INSCO, Ltd. (the designated policies).[3] Part A of Phase II answered, among other questions, what "facts must Braun show to demonstrate a prima facie case under the designated umbrella/excess insurance policies' terms and conditions that the limits of the liability of the applicable primary policy/policies have been paid/satisfied/exhausted?" As relevant here, the court ruled that in order to trigger coverage under the designated policies, Braun must establish horizontal exhaustion if the policy either "expressly so provides or . . . contains an 'other insurance clause' and does not provide for vertical exhaustion of specific policies."

Part B of the Phase II trial was to be conducted in two parts. First, the court would determine, based on the language of the designated policies, whether horizontal or vertical exhaustion was required and then whether Braun's evidence established exhaustion. Following trial on these issues, the court determined that "each of the eight first level policies requires horizontal exhaustion of all primary insurance applicable to a

---

[3] London, Stonewall Insurance Company, and INSCO, Ltd. settled with Braun and were dismissed from the appellate proceedings in February 2019. We consider the arguments regarding their policies, however, as those rulings formed the basis of the judgment in favor of many of the remaining insurers.

loss before being triggered for that loss." At the second part of the Phase IIB trial, held on October 25, 2012, Braun attempted to prove exhaustion with documents purportedly obtained from its three primary insurers, along with three declarations stating that the documents reflected the amounts paid in settlement of asbestos claims. The trial court excluded that evidence as hearsay, leaving Braun with no evidence of exhaustion.[4] Accordingly, the court granted the insurers' motion for nonsuit under Code of Civil Procedure section 631.8.

The purpose of the Phase IIC trial was to determine the impact of the various Phase IIB decisions on the 137 remaining excess policies. The court indicated that it would interpret each of the remaining excess policies but that Braun was bound by the finding in the Phase IIB trial that "[n]one of the first level excess policies were triggered" so that "[n]one of the remaining excess policies that require 'exhaustion' of any or all of the first level excess policies can attach because of the failure of those first level excess policies to have attached."

In its Phase IIC decision, the trial court concluded that each of the remaining policies require horizontal exhaustion. The court found that Braun was bound by its failure to prove horizontal exhaustion in the Phase IIB trial and refused to consider new evidence proffered in support of exhaustion.

Thereafter, judgment was entered in favor of the excess insurers and Braun timely filed a notice of appeal. The excess insurers timely filed a protective cross-appeal challenging an element of the trial court's Phase IIA decision.

**Discussion**

## I. The Direct Appeal

Braun contends the court erred in interpreting the excess insurers' policies to require horizontal rather than vertical exhaustion and alternatively, if the policies require horizontal exhaustion, that the court erred in excluding its new evidence of exhaustion proffered during Phase IIC of the trial.

---

[4] On appeal, Braun does not challenge the court's evidentiary ruling.

4

## A. Policy Interpretation

Whether an excess insurer's policy is subject to horizontal or vertical exhaustion is a matter of contract interpretation subject to our de novo review. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 389-390.) The rules governing the interpretation of insurance contracts are well settled. " ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.] [¶] ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." ' " (*Id.* at pp. 390-391.) In addition, "We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage." (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 49.)

### a. Montrose III

In *Montrose III*, *supra*, 9 Cal.5th at page 237, the court held, under the language of the excess insurance policies before it, that "in a case involving continuous injury, where all primary insurance has been exhausted, . . . the insured [may] access any excess policy for indemnification during a triggered policy period once the directly underlying excess insurance has been exhausted." Although the decision related only to whether vertical or

5

horizontal exhaustion is required to trigger coverage under higher level excess policies once all primary coverage has been exhausted, the Supreme Court's reasoning is instructive in determining whether horizontal exhaustion is required before all outstanding primary coverage has been exhausted. The court rejected the insurers' argument that horizontal exhaustion is required by the "other insurance" clauses included in those policies. (*Id.* at pp. 224-225) The court explained that the language of "other insurance" clauses does not unambiguously call for horizontal exhaustion.[5] The court pointed out that policy language disclaiming coverage for amounts covered by "other underlying insurance," or requiring exhaustion of "all underlying insurance," can "fairly be read to refer only to other directly underlying insurance in the same policy period that was not specifically identified in the schedule of underlying insurance, anticipating that

---

[5] The excess policies in *Montrose III* described "other insurance" coverage in a variety of ways. The court provided the following examples: "Some policies provide that they will 'indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the [scheduled] underlying insurance,' and then define 'loss' as 'the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable, after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy.' Some policies state that the insurer is liable for 'the ultimate net loss in excess of the retained limit' and define 'retained limit' to mean, among other things, the 'total of the applicable limits of the underlying policies listed in [a schedule] [and] the applicable limits of any other underlying insurance collectible by the insured.' Under a 'Loss Payable' provision, one policy provides it will pay 'any ultimate net loss,' which is separately defined as 'the sums paid in settlement of losses for which the Insured is liable after making deductions for all recoveries, salvages and other insurance (other than recoveries under the underlying insurance, policies of co-insurance, or policies specifically in excess hereof).' Under a 'Limits' provision, some policies provide that 'the insurance afforded under this policy shall apply only after all underlying insurance has been exhausted.' One policy states that '[i]f other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance.' " (*Montrose III*, *supra*, 9 Cal.5th at pp. 224-225.)

6

the scheduled underlying insurance may later be replaced or supplemented with different policies." (*Id.* at pp. 230-231.)

While the "other insurance" provisions did not unambiguously require horizontal exhaustion, the court found that the policy provisions specifying when coverage attaches and defining "underlying insurance" strongly suggest that only vertical exhaustion was required. The court noted that most excess policies explicitly reference an attachment point, typically by reference to a specific dollar amount of underlying insurance in the same policy period that must be exhausted, and that the excess policies regularly include or reference schedules of underlying insurance for the same policy period that must be exhausted before that excess policy may be accessed.[6] To explain why only vertical exhaustion should be required, the court referred to one of the policies under which the excess insurer agreed "to indemnify Montrose once it has exhausted $30 million of underlying insurance. But under the insurers' theory of horizontal exhaustion, Montrose would not be permitted to access this policy until it has exhausted $30 million of underlying insurance *for every relevant policy period*—which would add up to substantially more than $30 million. Indeed, here, where the continuous injury occurred over the course of a quarter century, such a rule would increase the operative attachment point for this policy from $30 million to upwards of $750 million. Thus, where aggregate liability amounts to approximately $200 million, Montrose would not be able to access an

---

[6] The excess policies all contain language requiring the insured to "exhaust" the limits of "underlying insurance" before the policy provides coverage. The court described the four main ways the policies describe underlying insurance: "(1) Some policies contain a schedule of underlying insurance listing all of the underlying policies in the same policy period by insurer name, policy number, and dollar amount. [¶] (2) Some policies reference a specific dollar amount of underlying insurance in the same policy period and a schedule of underlying insurance on file with the insurer. [¶] (3) Some policies reference a specific dollar amount of underlying insurance in the same policy period and identified one or more of the underlying insurers. [¶] (4) Some policies reference a specific dollar amount of underlying insurance that corresponded with the combined limits of the underlying policies in that policy period." (*Montrose III*, *supra*, 9 Cal.5th at pp. 223-224.)

insurance policy that, by its terms, kicks in after $30 million of underlying insurance is exhausted." (*Id.* at pp. 233-234.) The court continued, "Relatedly, the excess policies regularly include or reference schedules of underlying insurance—all for the same policy period. Under Montrose's reading, these schedules provide a presumptively complete list of insurance coverage that must be exhausted before the excess policy may be accessed, with the 'other insurance' clauses serving as a backstop to prevent double recovery in the rare circumstance where underlying coverage changes after the excess policy is written. [Citation.] But under the insurers' rule of horizontal exhaustion, these schedules would represent only a fraction—perhaps only a small fraction—of the insurance policies that must be exhausted before a given excess policy may be accessed." (*Id.* at p. 234.)

The court's opinion expressly leaves unanswered the question now before us: when the insured has incurred continuous losses extending over the coverage periods in multiple primary policies, whether all primary insurance covering all time periods must be exhausted ("horizontally") before the first level excess policies are triggered, or, as Braun contends, whether coverage under the excess policies is triggered once the directly underlying primary policies specified in each excess policy is exhausted ("vertically"). (*Montrose III, supra*, 9 Cal.5th at p. 226, fn. 4 ["Because the question is not presented here, we do not decide when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted."].)

### b. The Designated First-level Excess Policies

Five of the designated policies (London policy Nos. 1331, 1336, 2046, and 5003A and Stonewall policy No. D11178) provide that liability attaches "only after the primary and underlying excess insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as set forth in the schedule in item 8(a)" and that "the limits of the underwriters' liability will be such amount of ultimate net loss as will provide the assured with total limits under the policy/ies of the primary and underlying excess insurers and this insurance combined as set forth in item 8(b) of the schedule under the designation of 'total limits' . . . ." The schedule of underlying policies identifies certain primary insurance policies and their limits and concludes with the

8

language "and any and all policies arranged by or on behalf of the assured as renewals, replacements or otherwise." The policies define the excess insurer's "ultimate net loss" as "the amount payable in settlement of the liability of the assured after making deductions for all recoveries and for other valid and collectable insurances, excepting however the policy/ies of the primary and underlying excess insurers, and shall exclude all expenses and costs." The policies incorporate the "other insurance" clauses in the primary policies, which provide, "If the named insured has other insurance against a loss covered by this policy, the insurance provided by this policy shall be in excess of such other valid and collectable insurance."[7] Two of the designated policies (INSCO policy Nos. F3B2/0871-FC/R and F4B2/0871-FC/R) also provide that coverage is triggered upon the exhaustion of specified scheduled policies plus "any and all policies arranged by or on behalf of the assured as renewals, replacements or otherwise." These two policies incorporate the "other insurance" provisions of the underlying policies but do not contain the definitions of "ultimate net loss" contained in the other designated policies.

These first-level excess policies contain comparable language to that interpreted in *Montrose III*. The "other insurance" clauses are similarly ambiguous and the "other aspects of the insurance policies" including the scheduling of the applicable primary policies and definitions of ultimate net loss suggest "the exhaustion requirements were meant to apply to directly underlying insurance and not to insurance purchased for other policy periods." (*Montrose III, supra*, 9 Cal.5th at p. 233.) Despite the similarity in language, the excess insurers contend that *Montrose III* "did not disturb longstanding California law requiring exhaustion of all primary insurance before any excess policy attaches." They argue, "The fundamental distinctions between primary and excess insurance have been noted and reaffirmed time and time again by California courts that have uniformly required primary insurance to be exhausted in continuous injury cases

---

[7] One policy (London policy No. 1384) is identical to these policies except that the schedule is missing. According to the stipulation of the parties, the schedule is missing because it has not been found rather than it never existed.

9

before excess policies are implicated. [Citation.] Indeed, the rule of horizontal exhaustion at the primary level is premised on several factors that were absent in *Montrose,* including that: (i) primary policies attach as first dollar coverage and have an immediate obligation to respond; (ii) primary policies receive significantly higher premium and offer lower limits in consideration for greater claims adjustment and defense resources; and (iii) primary coverage has the right to control defense and settlement without input from excess insurers." (Fn. omitted.) The excess insurers cite cases discussing these "qualitative differences" between primary and excess policies and argue that these differences compel the conclusion that an insured under an excess policy must be required to horizontally exhaust all primary coverage before the excess policy is triggered. (See *Signal Companies v. Harbor Insurance Company* (1980) 27 Cal.3d 359, 365 ["The policyholder pays for two kinds of liability coverage, each at a different rate. The premium charged by the primary insurer . . . takes into account costs of defense, including legal fees, which the primary insurer normally provides."] *Diamond Heights Homeowners Association v. National American Insurance Company* (1991) 227 Cal.App.3d 563, 577-578 ["Generally, the primary insurer alone owes a duty to provide and bear all costs of the defense, with a corresponding right of control over the defense. The excess carrier has no right or duty to participate in the defense, absent contract language to the contrary, until the primary policy limits are exhausted."].)

Initially, we note that the differences between primary and excess coverage hold true whether vertical or horizontal exhaustion applies. More importantly, the differences provide little justification for construing the policy language interpreted in *Montrose III* differently simply because primary coverage purchased often many years later for other policy periods remains outstanding.

As to the difference in the premiums paid for primary and excess coverage, the designated policies calculated premiums on a percentage ranging from 6 percent to 25 percent of the underlying primary insurance premiums. The premiums reflect the different risks and obligations assumed by primary and excess insurers. The evaluation of risk based on the assumption of vertical exhaustion is straightforward and can be made

based on known parameters. However, if the risk assessment were to be made based on the assumption of horizontal exhaustion, the evaluation would be speculative and unpredictable. Under the eight designated policies, coverage is specified to attach on six of the policies after $1,000,000 in ultimate net loss and after $250,000 in ultimate net loss for the remaining two policies. If horizontal exhaustion of all primary insurance were required to trigger the coverage, the level of liability at which the excess coverage would attach would be unascertainable. Braun would not be permitted to access coverage under the excess policies until it had exhausted all primary insurance for each of the years during which damage occurred. In a continuing loss case such as this, coverage would not be triggered until Braun had incurred losses far in excess of $250,000 or $1 million. The difference between premiums paid for excess and for primary policies does not justify an interpretation that renders the point of attachment so unpredictable and unascertainable when the policy is issued.

Nor do the differing defense obligations compel horizontal exhaustion. It is well settled that an excess insurer has no duty to defend unless the underlying primary insurance is exhausted, absent policy language to the contrary. (*Signal Companies, Inc. v. Harbor Ins. Co.*, *supra,* 27 Cal.3d 359, 368–369.) This rule applies whether horizontal or vertical exhaustion is required. From the perspective of the insured, one would reasonably expect the excess insurer to contribute to the defense once the scheduled primary policies have been exhausted and the attachment points reached. (See *Montrose III*, *supra*, 9 Cal.5th at p. 234 ["Consideration of the parties' reasonable expectations favors a rule of vertical exhaustion rather than horizontal exhaustion."].) That is the benefit for which the insured paid premiums. (*Id*. at p. 236 ["[V]ertical exhaustion in a continuous injury case" allows for "immediate access to the insurance it purchased."].) Interpreting the provisions of the excess policies to mean what the Supreme Court in *Montrose III* held they mean will, in the absence of explicit language to the contrary, require the excess carriers to assume responsibility for defense and indemnity once the directly underlying primary policies have been exhausted. Whatever the rights of the excess carriers may be to contribution from primary insurers whose

11

policies do not directly underlie the excess policy is a different question that is not now before us, and on which we express no opinion. We hold simply that (absent an explicit policy provision to the contrary) the insured becomes entitled to the coverage it purchased from the excess carriers once the primary policies specified in the excess policy have been exhausted.

Prior to the Supreme Court's decision in *Montrose III,* some appellate courts concluded that in a continuing loss situation, an excess insurer has no obligation "to 'drop down' and provide a defense to a common insured before the liability limits of *all* primary insurers on the risk have been exhausted." (*Community Redevelopment Agency v. Aetna Casualty & Surety Co*. (1996)50 Cal.App.4th 329, 332; see also *Padilla Constr. Co. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984, 986 ["California's rule of 'horizontal exhaustion' in liability insurance law requires all primary insurance to be exhausted before an excess insurer must "drop down" to defend an insured, including in cases of continuing loss."].) These cases, however, rely on an interpretation of policy language rejected by the Supreme Court in *Montrose III.* (See *Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 341; *Padilla Constr. Co. v. Transportation Ins. Co.*, *supra*, 150 Cal.App.4th at p. 988.) While those cases hold, for example, that "other insurance" clauses preclude attachment of coverage until there has been horizontal exhaustion, *Montrose III* holds otherwise. Moreover, insofar as *Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 341 addresses the relative obligations as between the various insurers, and not the excess insurer's obligations to the insured, it is distinguishable. While the court in *Padilla*, *supra*, 150 Cal.App.4th at page 988, involved an action by an insured seeking declaratory relief against its excess insurer, the court's extension of *Community Redevelopment* can no longer be justified after *Montrose III.*

### c. *The remaining excess insurance policies*

The trial court concluded that each of the remaining 137 excess insurance policies require horizontal exhaustion. Braun challenges the trial court's conclusion as to two categories of policies. First, Braun challenges the court's determination with respect to five higher level excess policies issued between 1981 and 1986 to Santa Fe International

12

and its subsidiaries, which includes Braun.[8] Each policy includes among the "interest covered" "all sums which the assured shall be obligated to pay or incurs as costs and/or expenses by reason of liability imposed on the assured by law or assumed by the Assured under contract or agreement on account of personal injury . . . all in connection with the land and/or airborne and/or waterborne operations of the assured." The policies provide that the insurers "shall only be liable for the excess of . . . the amount covered under assured's primary comprehensive general and automobile liability, protection and indemnity and excess emp1oyers' liability policies where interests are insured thereunder and also hereunder, it being understood and agreed that such primary insurances may have anniversary dates other than 1st July."[9] The policies do not contain schedules identifying the primary or underlying insurance to which they are excess. The policies also include a generally worded "other insurance" provision.[10] Under *Montrose III, supra,* 9 Cal.5th at pages 232-233, the excess insurers' reliance on the "other insurance" provision is not well taken. To the contrary, the reference in the policies to underlying primary insurance by date supports the conclusion that exhaustion is required only of primary policies that overlap with the policy period of the excess policies.

Finally, Braun challenges the trial court's ruling with respect to a single excess policy issued by London covering the period from December 1985 to December 1986.

---

[8] These policies provide a layer of coverage between $10 million and $100 million in "towers" of coverage that total between $100 million and $290 million in coverage annually. By extension, Braun challenges the court's determination as to an additional 21 policies that follow form to one of the five policies at issue.

[9] Four of the policies are identical. The fifth policy, which was the first entered, reads: "It being understood and agreed that such primary insurance has an anniversary date of 1st December but 1st January [with] respect [to Braun's] primary automobile liability policy."

[10] The "other insurance" provisions read: "Other insurances are permitted. [¶] If any named assured hereunder, or any person or organization now or hereafter named as assured or additional assured, has any other valid and collectible insurance against loss covered by this policy, the insurance afforded by this policy with respect to such assured or additional assured and such loss shall, in all cases, be excess of all other insurance carried by or inuring to the benefit of such assured or additional assured."

This policy provides $5 million in coverage for each occurrence in excess of $5 million per occurrence. The policy provides, "The assurer shall be liable for the excess where the amount deductible under this policy is exceeded by (A) the cost of investigating and/or successfully defending any claim or suit against the assured based on liability or an alleged liability of the assured covered by this insurance, or (B) the amount paid by the assured either under judgment or an agreed settlement based on the liability covered herein including all costs, expenses of defense and taxable disbursements." This policy expressly attaches upon satisfaction of the deductible amount and does not require horizontal exhaustion. (*State of California v. Continental Ins. Co.* (2017)15 Cal.App.5th 1017, 1032.) The fact that the policy incorporates a generally worded "other insurance" clause from another policy does not negate the unambiguous language requiring vertical exhaustion. (*Montrose III*, *supra,* 9 Cal.5th at pp. 232-233; *Carmel Development Co. v. RLI Ins. Co.* (2005) 126 Cal.App.4th 502, 511.) The trial court erred in concluding otherwise.

### B. *Evidence of Exhaustion*

The excess insurers contend that even if the trial court incorrectly interpreted their policies to require horizonal exhaustion of the primary policies, this court must still affirm the judgment because the error was not prejudicial. They point out that Braun failed to present admissible evidence of exhaustion of *any* primary policy during the Phase II trial and argue that Braun's subsequent attempts to introduce such evidence was properly rejected. The excess insurers explain, "To be clear, respondents are not arguing that Braun can never try to establish that there has been exhaustion of primary policies based solely on *post-Phase IIB* payments of claims that exhaust the primary aggregate limits. But this judgment should be affirmed. Braun may not introduce in this case any evidence of claim payments that existed at the time of the October 2012 Phase IIB trial. . . . Braun cannot now seek to prove primary exhaustion by combining better evidence of 'old' payments and 'new' payments." (Boldface omitted.)

We cannot agree. Faced with a ruling requiring horizontal exhaustion of all primary policies, there was no reason for Braun to introduce evidence of vertical

exhaustion. The failure to do so hardly suggests the absence of such evidence. The error in interpretation alone requires remand for the opportunity to present such evidence. Moreover, even if the underlying policies were not exhausted in 2012, they may well have been subsequently exhausted and there is no good reason to require Braun to file new proceedings to obtain the coverage that has now attached. Contrary to the excess insurers' argument, Braun is not barred from relying on evidence of payments made on claims before October 2012 if together with subsequent payments the primary limits have been exceeded.

## II.    Cross-appeal

Respondents filed a protective cross-appeal challenging one aspect of the trial court's Phase IIA decision regarding the burden of proof to establish that the claims paid by Braun's primary insurers were correctly allocated to products liability claims rather than "premises/operations" claims. Because we shall remand to permit Braun to submit additional evidence of exhaustion in conformity with our interpretation of the excess policies as requiring vertical exhaustion, we address the merits of respondents' cross-appeal.

In its Phase IIA decision, the trial court concluded that "absent provision in a designated policy expressly to the effect that coverage will not occur unless and until payment of underlying insurance limits is made and is demonstrated to be properly allocated then proper allocation need not be shown by Braun as part of its prima facie case." The court held that Braun may rely on the allocations made by its primary insurers in satisfying its burden of proof.[11] The court explained that a "requirement that Braun prove that each payment under the underlying policies was properly allocated would be a huge if not impossible task. In part each underlying claim and there are large number of them here would have to be analyzed. This could implicate attorney work product and attorney client communications held by those who made the original allocation decision.

---

[11] Under the terms of various settlement agreements, all of the underlying claims were designated as products liability claims.

Many payments under the underlying policies likely involved judgment calls by whoever was administering claims resolution. Revisiting those decisions could be daunting. [¶] The excess insurers have not demonstrated any ambiguities in any designated policy threshold of coverage or attachment of liability language. Even if there were such ambiguities it would not be reasonable to interpret the policies to include the requirement that Braun prove that each payment under the underlying policies was in accordance with the terms of such policy. [¶] Further support for this conclusion is found in the duty of good faith and fair dealing that is implied in every insurance policy under California law. [Citation.] Among other things this duty requires that the underlying insurers were obligated to conduct thorough investigations of claims which provides a sufficient degree of reliability to the decisions made. [Citation.] In light of this duty it would not be reasonable to interpret the designated policies as requiring that Braun must prove that any payment allocations of the underlying coverage payments were in accordance with the provisions of the respective policies."

The court acknowledged, however, that once Braun has made its prima facie showing, the excess insurers may submit evidence negating one or more elements of the prima facie case. The court expressly held that Braun retains the burden of proving all elements of its claim for coverage and that the excess insurers "do not have the burden of proof as to matters for which they submit evidence to demonstrate that notwithstanding Braun's evidence, Braun cannot establish a prima facie case."

We find no error in the court's ruling. The excess insurers assert " 'the burden is on the insured to bring the claim within the basic scope of coverage.' " (*Waller v. Truck Insurance Exchange, Inc*. (1995) 11 Cal.4th 1, 16; *Aydin Corp. v. First State Ins. Co*. (1998) 18 Cal.4th 1183, 1188.) Respondents do not dispute that the underlying claims are covered. They dispute how payments purportedly on those claims should be allocated. The trial court correctly held that Braun could satisfy its burden by relying on the primary insurer's allocation. Contrary to the excess insurer's argument, the trial court's ruling did not prevent them from challenging that showing with respect to any given claim. The excess insurers suggest that the "trial court held that the excess insurers could only

16

challenge the primary insurers' characterization [of a claim as a product liability claim] in very limited circumstances, such as by showing bad faith, fraud or collusion on the part of Braun." We find no such limitation in the court's decision. The court merely held that respondents carry the burden of producing evidence of any affirmative defenses, but that Braun retains the burden of proving its right to coverage if presented with evidence disputing its prima facie showing.[12] Accordingly, we find no merit in the excess insurers' cross-appeal.

### Disposition

The judgment is reversed, and the matter remanded for further proceedings. The parties are to bear their own costs on appeal.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
TUCHER, J.

---

[12] Since respondents offered no such evidence, we need not consider in the abstract what facts might be shown to negate the prima facie showing. We note such out-of-state decisions as *Carrier Corp. v. Allstate Ins. Co.* (N.Y.Sup.Ct., Nov. 21, 2018, No. 2005-EF-7032) 2018 N.Y.Misc. Lexis 6781, pp. *14-*15 ["An excess insurer may not challenge the propriety of a primary insurer's payment or allocation decisions absent collusion to defraud the excess insurer"], but have no occasion to pass on such matters at this juncture.

| | |
|---|---|
| Trial court: | City & County of San Francisco Superior Court |
| Trial judge: | Honorable Richard A. Kramer and Mary E. Wiss |
| Counsel for Plaintiff and Appellant SantaFe Braun, Inc.: | MORGAN, LEWIS & BOCKIUS LLP<br>Thomas M. Peterson<br>Jeffrey S. Raskin<br>Michel Y. Horton<br>David S. Cox |
| Counsel for Defendants and Appellants on behalf of excess insurers: | NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP<br>Sara M. Thorpe<br><br>BERKES CRANE ROBINSON & SEAL LLP<br>Steven M. Crane<br>Barbara S. Hodous |

A151428